# UNDER SEAL

Unsealed
all defendants
arrested per USA

IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED

JUN 14 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 1:11-mj-455 |
| | ) | |
| ANTHONY GUIDRY, SR., | ) | |
| a/k/a "Ant," | ) | |
| | ) | |
| JUSTIN DACORY JOHNSON, | ) | |
| a/k/a "Jay," | ) | |
| | ) | |
| JAMES CODY CUTRI, | ) | |
| | ) | |
| MUNIR ABDALLA SAAD, | ) | |
| a/k/a "Saad Munir Abdalla," | ) | |
| | ) | |
| MARVIN POWERS, JR., | ) | |
| a/k/a "Marv," | ) | |
| | ) | |
| NOE BRIONES, | ) | |
| | ) | |
| MOATAZ MOHAMMAD MASOUD, | ) | |
| a/k/a "Mo," "Fat Mo," "Gyp," | ) | |
| | ) | |
| NAHOM HAGOS, | ) | |
| a/k/a "Fat Boy," | ) | |
| | ) | |
| YONATA NOAH HAGOS, | ) | |
| a/k/a "Yoni," "Yone," "Little Black Boy," | ) | |
| | ) | |
| NATHANIEL SCOTT WILSON, | ) | |
| a/k/a "Nate," | ) | |
| | ) | |
| JEREMIAH ADAM WILSON, | ) | |
| a/k/a "Jay," | ) | |
| | ) | |
| JULIUS JAMAR WATSON III, | ) | |
| a/k/a "Ju Ju," | ) | |
| | ) | |
| TRACY CHRISTOPHER KING, | ) | |
| a/k/a "T.C.," | ) | |

1

③

CRISTINA DELORES PATINO,      )
     )
     )
TIFFANY NICOLE SOLORIO,      )
  a/k/a "Tiff,"      )
     )
      Defendants.      )

## AFFIDAVIT IN SUPPORT OF
## ARREST WARRANTS AND CRIMINAL COMPLAINT

Your affiant, Glenn Mai, being duly sworn, states as follows:

1.      This affidavit is submitted in support of a criminal complaint and arrest warrants

for Anthony GUIDRY, Sr., (a/k/a "Ant"), Justin Dacory JOHNSON (a/k/a "Jay"), James Cody

CUTRI, Munir Abdalla SAAD (a/k/a "Saad Munir Abdalla"), Marvin POWERS, Jr., (a/k/a

"Marv"), Noe BRIONES, Moataz Mohammad MASOUD (a/k/a "Mo", "Fat Mo", "Gyp"),

NAHOM Hagos (a/k/a "Fat Boy"), YONATA Noah Hagos (a/k/a "Yoni", "Yone", "Little Black

Boy"), NATHANIEL Scott Wilson (a/k/a "Nate"), JEREMIAH Adam Wilson (a/k/a "Jay"),

Julius Jamar WATSON III (a/k/a "Ju Ju"), Tracy Christopher KING (a/k/a "T.C."), Cristina

Delores PATINO, and Tiffany Nicole SOLORIO (a/k/a "Tiff").[1]

2.      Your affiant submits that there is probable cause to believe that, from in or about

2005 until the present date, within the Eastern District of Virginia and elsewhere, the above-

captioned defendants did unlawfully, knowingly and intentionally combine, conspire,

confederate and agree with each other and with other persons, both known and unknown, to

unlawfully, knowingly and intentionally distribute 100 kilograms or more of a mixture and

substance containing a detectable amount of marijuana, a Schedule I controlled substance, in

violation of Title 21, United States Code, Sections 841(a)(1) and 846.

---

[1] The defendants will be referred to hereinafter by the portion of their name, either first or last, that in this paragraph is in all capitalized letters.

3.      Additionally, your affiant submits that the evidence described in this affidavit establishes that, in the course of the conspiracy, that certain of the above-captioned defendants have committed several additional criminal offense, to include: conspiracy to distribute 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; conspiracy to distribute oxycodone, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; conspiracy to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; money laundering, and attempt and conspiracy to do the same, in violation of Title 18, United States Code, Section 1956; possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g); possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); conspiracy to commit a crime of violence to further a business enterprise involving narcotics or controlled substances, in violation of Title 18, United States Code, Section 1952; and conspiracy to bring in and harbor an alien, in violation of Title 8, United States Code, Section 1324.

## AGENT BACKGROUND

4.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

5.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed with the FBI since September 18, 1995. I have received extensive training in criminal law enforcement from the FBI Academy in Quantico, Virginia, including training in drug identification, drug distribution methods and law enforcement techniques related to drug

trafficking. As a Special Agent with the FBI, I have applied for and obtained arrest and search warrants and have participated in the investigation of narcotics-related offenses resulting in arrests and convictions. As a narcotics investigator, I have interviewed over a hundred individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale importation, manufacture, and distribution of controlled substances. In these interviews, I have also obtained information regarding the means through which individuals involved in drug trafficking launder money and hide the assets acquired through drug distribution. Though my training and experience, I am familiar with the actions, habits, traits, methods and terminology utilized by the traffickers and abusers of controlled dangerous substances.

6.    Through my training, experience, and conversations with other experienced investigators and law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations and their use of telephones and other devices to conduct their criminal enterprises; including the use of fictitious subscriber names to conceal their identities and thwart investigation of their illegal activities.

7.    All information contained in this affidavit is either personally known to me, has been related to me by other law enforcement officers and/or confidential sources, or has been related to me by records and documents gathered during this investigation, as noted.

8.    This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government.

## PROBABLE CAUSE

I.    BACKGROUND ON MARIJUANA TRAFFICKING

9.      Based on my training and experience, I know that much of the marijuana sold in

the United States is also cultivated in the United States. California is one of the most significant

source areas for domestically produced marijuana because, among other reasons, under state law

the drug can be produced and consumed for certain medicinal purposes. Marijuana growers and

producers often cultivate marijuana on their own property in underground rooms serviced by

specialized lights intended to facilitate marijuana growth, in outdoor green houses, and in open

fields on rural plots of land. It is common for areas that function as marijuana nurseries to be

referred to as "grow operations", "grow houses", or simply "grows". After marijuana plants are

grown and harvested, growers generally either sell the plants directly to people for use in their

own grow operation, or dry the marijuana and sell it by the pound to wholesale buyers. I further

know marijuana growers and wholesale purchasers often that send marijuana via mail or

common carrier to other parts of the United States, where it is sold for profit.

10.     Based on my training and experience, marijuana typically is sold at the retail level

in ounce or smaller quantities, though it can also be sold by the pound. The price of a pound of

marijuana can vary significantly depending on the particular variety or "strain" of marijuana

being sold, as well as whether it was grown outdoors or indoors. My investigation into this

conspiracy has revealed that pounds of marijuana can be purchased wholesale from a grower or

person with a direct connection to a grower for as little as $1,200, and can be sold at the retail

level for as much as $5,000 or more. Strains of marijuana often are labeled with names that

reflect the qualities of the marijuana, including the color, smell, potency, and/or resultant high.

For example, "Purple", or "Purp" for short, is used to describe marijuana typically grown in

cooler, higher altitudes, which presents a purple color and is known for its high potency. Other strains of marijuana include, but are not limited to, AK-47, Blue Dream, Blue Hawaiian, Chem Dog, Cotton Candy, Goo, Granddaddy, Grape Ape, Green Crack, Kush (which itself comes in various forms like Lemon, King Kong, Orange, Pineapple, and Strawberry), L.A. Confidential, Lavender, Maui Wowie, O.G., Permafrost, Purple Urkle, SSD, Sour Diesel, T2, Train Wreck, and White Grape.

## II.     INVESTIGATION BACKGROUND

11.     Since approximately December 2009, the FBI, the United States Postal Inspection Service ("USPIS"), and local law enforcement agencies have been conducting an investigation into the marijuana trafficking and money laundering activities of a group engaged in the nationwide distribution of marijuana grown in northern California and sent, generally in multiple-pound quantities, to numerous other states through the United States Postal Service ("USPS") and common couriers like FedEx and UPS, where it is then distributed at the retail level. Co-conspirators use various methods to remit the proceeds generated by the sale of the marijuana, including deposits into a network of bank accounts, money orders, and bulk cash smuggling (by human couriers and through the mail). A conservative estimate of the proceeds generated in the course of the conspiracy is $2,000,000.

12.     This investigation began when local law enforcement agencies uncovered in and around January 2010 a marijuana distribution network operating in the Eastern District of Virginia and the Washington, D.C., metropolitan area. It was determined that CUTRI, who resides in the Eastern District of Virginia, was obtaining multiple-pound quantities of marijuana from JOHNSON, who resides in northern California, through the mail and common couriers, and then distributing the marijuana at the retail level himself and/or through other co-conspirators, to

include MASOUD, NAHOM, and YONATA, all three of whom also reside in the Eastern District of Virginia.

13.     Investigative methods employed have included interviews of confidential sources[2], controlled deliveries of packages containing bulk cash and marijuana, controlled purchases of marijuana, physical surveillance, consensually monitored phone calls, the examination of wire transfers, bank accounts, and other financial instruments, and the execution of search warrants on e-mail accounts and on intercepted marijuana and bulk cash packages. To date, the aggregate total of marijuana seized during this investigation is approximately 71 pounds, while the aggregate total of U.S. currency and money orders seized is approximately $161,980.

14.     Additionally, United States District Judge Liam O'Grady, of the United States District Court for the Eastern District of Virginia, issued Orders authorizing law enforcement to intercept wire (and also, in some cases, electronic) communications related to this conspiracy on seven cellular telephones. Over 12,000 intercepted wire communications and over 2,000 intercepted electronic communications (text messages) have been deemed pertinent to this investigation.

15.     Interception of Target Telephone #1, used by CUTRI, commenced on February 8, 2011, and terminated on February 15, 2011. Interception of Target Telephone #2, used by CUTRI, commenced on February 23, 2011, and terminated on April 14, 2011. Interception of Target Telephone #3, used by JOHNSON, commenced on March 9, 2011, and terminated on

---

[2] This affidavit references information obtained from several confidential sources of information. As to the information provided as described herein, each of the confidential sources referred to herein have been found by law enforcement to be reliable and credible, and their statements have often been corroborated by other sources or events. Regardless of their true gender, each of the confidential sources referred to herein will be referred to in the masculine gender.

May 21, 2011. Interception of Target Telephone #4, used by GUIDRY commenced on March 30, 2011, and is ongoing. Interception of Target Telephone #5, used by BRIONES, commenced on March 28, 2011, and terminated on April 26, 2011. Interception of Target Telephone #6, used by SAAD, and Target Telephone #7, used by NAHOM, commenced on April 28, 2011. Interception of Target Telephone #6 terminated on May 19, 2011, and interception of Target Telephone #7 terminated on May 3, 2011.

16.     During the course of intercepting communications over these telephones, all of the defendants who used their respective telephone(s) identified themselves by their first and/or last name, and/or were identified as such by the person with whom they were communicating. Furthermore, Target Telephone #3 was registered in JOHNSON's name, Target Telephone #6 in SAAD's, and Target Telephone #4 was registered in GUIDRY's wife's name and previous to that was registered in his name.

17.     This affidavit includes draft, summary quotations of select phone conversations that were intercepted. Not all relevant portions of such conversations have been described. The draft, summary quotations herein are based on preliminary summaries prepared by wiretap monitors and reviewers involved in this investigation. The quoted summary segments are based on line sheets and reviews of recordings and are not final or certified transcripts. Additionally, all dates and times are approximate and based on the monitoring equipment at the time the call was intercepted. Where portions of the intercepted conversations were unintelligible upon first review, that portion is noted with "[UI]". Where your affiant has concluded, based on this investigation and my training and experience, the likely meaning of a conversation, or a portion of an intercepted conversation, my conclusions are contained in [brackets] within the quoted conversation.

III.  OVERVIEW OF CONSPIRACY AND DEFENDANTS' ROLES

18.  The core of this conspiracy is a group of interconnected wholesale distributors of marijuana who reside in northern California, including GUIDRY, JOHNSON, SAAD, and POWERS. Each of these defendants have their own relationships with different marijuana growers in northern California, from whom they obtain wholesale quantities of the drug, but they also supply one another when, for instance, one defendant has a supply of a particular strain that another defendant cannot obtain through other means, or when one defendant comes across a good price on a wholesale amount and lets another defendant in on the deal. GUIDRY, JOHNSON, SAAD, and POWERS then ship the marijuana, generally in multiple-pound quantities, to their distribution outlets throughout the United States.

19.  GUIDRY has acknowledged in intercepted communications, and the investigation has corroborated, that he taught JOHNSON, POWERS, and SAAD how to deal marijuana in this manner. For instance, on May 26, 2011, he told SAAD, "I'm not trying to dictate who you do business with, but you know what, I schooled all of you guys," (TT4 #8634)[3], while on June 4, 2011, in the course of asking GUIDRY for advice on how best to avoid bank and law enforcement scrutiny when dealing with drug proceeds, JOHNSON referred to GUIDRY as "the father of all this shit." (TT4 #9727). Indeed, on June 7, 2011, GUIDRY referred to himself as "the tree [marijuana] man" and explained that was shipping marijuana to "Georgia, Colorado, Kansas City, Kansas, Kansas City, Missouri, Texas, Louisiana, Florida, New York, Manhattan, New Jersey, Pennsylvania." (TT4 #10162). He further explained on April 7, 2011, that he "can get ten, twenty, thirty pounds" at a time and that his operation is "set up everywhere." (TT4

---

[3] Quotes of intercepted communications include a reference to the Target Telephone on which the conversation was intercepted, indicated by "TT" followed by the number of the telephone, as well as the unique session number assigned to the communication.

#1050).

20.     NATHANIEL and JEREMIAH, twin brothers who live together in Atlanta, Georgia, and who met GUIDRY approximately six years ago, are distributing marijuana shipped to them by GUIDRY. So is KING, who is from the same neighborhood in California as GUIDRY but who recently moved to Norfolk, Virginia, within the Eastern District of Virginia. WATSON, who also is from the same part of California as GUIDRY, has agreed to move to other states to help GUIDRY further extend his distribution network. SOLORIO is believed to GUIDRY's daughter or stepdaughter who, in exchange for payment, flies around the country picking up bulk cash amounts of drug proceeds to bring back to GUIDRY and JOHNSON in California.

21.     JOHNSON's distribution network includes numerous states as well, but the person he deals with primarily, and to whom he ships the most marijuana, is CUTRI, who resides in the Eastern District of Virginia. MASOUD, NAHOM, and YONATA work with CUTRI to distribute the marijuana at the retail level. JOHNSON resides with PATINO, his girlfriend, who, among other things, helps to package and ship marijuana to CUTRI and others on JOHNSON's behalf.

22.     SAAD and POWERS work together to supply, among other people and places, a distribution network in Kansas and Missouri. Furthermore, GUIDRY currently is working with SAAD to acquire commercial property in California under the false pretense of using it for a legitimate plumbing business and with the intent of establishing a marijuana grow operation.

23.     Based on this investigation, your affiant believes that the members of the conspiracy are working to extend their marijuana distribution network to the broadest geographic area, with an aim of reaching markets where higher prices can be charged for the marijuana

obtained relatively cheaply in California. Furthermore, the members of the conspiracy, in particular, GUIDRY, have focused on establishing distribution outlets in and around college campuses to increase sales and profits. For example, on April 7, 2011, (TT4 #1090) GUIDRY described how he had met a nineteen-year-old college athlete who plays games "all over the country" and tried to recruit him to deal marijuana for GUIDRY because such athletes "are going to these other states and other colleges and, shit, one of their main objectives is to find that college and pretty soon you have the colleges. And you know what kind of money that's gonna generate."

24.     Additionally, several of the members of the conspiracy have acknowledged in intercepted communications that they possess firearms and are willing to commit acts of violence with those firearms and other weapons to further the goals of the conspiracy.

IV.     GUIDRY

        A.      Guidry's Distribution Network

25.     This investigation has revealed that GUIDRY, who lives in Vallejo, California, cultivates distribution outlets for marijuana in many locations across the country.[4]

26.     For example, on April 19, 2011, GUIDRY talked to an unindicted co-conspirator, UCC-5[5], about a customer he was trying to establish in Baltimore to whom he had provided some samples of marijuana: "Well I guess one of your cousins out in Baltimore . . . . Remember,

---

[4] GUIDRY was identified through various ways in this investigation, to include that Target Telephone #4 is subscribed in his wife's name and used to be subscribed in his name, he was frequently intercepted over his telephone and others self identifying himself, and physical surveillance of GUIDRY corroborated the substance of many intercepted telephone calls.

I told you I sent him a variety, I sent him four different kinds. He said he fell in love with all of them. He said it wasn't one that he loved more than the other. He said he just loved them all so he asked if we could send him a qp [quarter pound] of each one of them and he can give us half the money up front and half the money at the end. And I told [another unindicted co-conspirator, UCC-2], I'm like that's on you. My half of this whole thing is getting it and making sure it get there. Your half of this equation is you make sure we get paid." UCC-5 then asked, "What all you got right now?" GUIDRY responded, "Um, I got three Blue Dreams right now, off the hook Blue Dreams." UCC-5 said, "'Cause I got an order for five of them, two and three. Purps though." GUIDRY asked, "Going where?" UCC-5 replied, "One going to Arkansas and North Carolina." (TT4 #2444).

27.     On April 21, 2011, after UCC-5 sent GUIDRY a text message containing a particular address in Charlotte, North Carolina, law enforcement intercepted a package that had been sent to that address. The package was searched pursuant to a search warrant. Inside the parcel were four vacuum-sealed bundles of marijuana. The vacuum-sealed bags were written on with magic marker, with two labeled "Blue Dream" and two labeled "Grandaddy Purp." The packages had a total gross weight of 4.4 pounds.

28.     More examples of GUIDRY's distribution networks follow:

i.     *Distribution Network in Kansas and Missouri*

29.     In Spring 2011, a confidential source ("CS-1"), who resides in Kansas, provided

---

[5] Uncharged co-conspirators are referred to throughout this affidavit by "UCC" and a corresponding number. The numbers assigned each uncharged co-conspirator do not carry any significance and do not represent their respective position within the conspiracy. Nor are the uncharged co-conspirators numbered sequentially as they are referenced in this affidavit. Rather the numbers were previously assigned to them by the government for the purpose of record keeping.

information about GUIDRY and POWERS.[6] CS-1 is cooperating with law enforcement with the possible benefit of avoiding federal charges related to this investigation as well as of receiving consideration for pending local charges.

30.    In 2009, CS-1 learned that a friend of his, an athlete at a local college, was distributing marijuana supplied to him by GUIDRY and POWERS. In October 2009, POWERS recruited CS-1 to do the same. From then until March 2010, CS-1 ordered and received approximately eight to ten packages of marijuana from GUIDRY and POWERS. The first package contained one pound of marijuana, while CS-1 estimated that approximately ninety percent of the remaining packages contained five pounds of marijuana each. CS-1 told investigators that GUIDRY and POWERS instructed him to have the packages sent to addresses other than his own, to avoid the detection of law enforcement. He would then distribute the marijuana for sale.

31.    CS-1 told investigators that he paid about $5,000 per pound for the marijuana, which he repackaged into smaller quantities, reselling ounces for $350 to $375 each, thereby making a $600 to $1,000 profit per pound. CS-1 told investigators that GUIDRY and POWERS instructed CS-1 to deposit or transfer money to pay for the marijuana to certain bank accounts, or to send cash or cashier's check via the mail to addresses provided by GUIDRY. The addresses that CS-1 told law enforcement that he was instructed to use to send GUIDRY payments match the addresses known by law enforcement, based on surveillance and real estate databases, to be those of GUIDRY and close family members. CS-1 stated that the deposits or transfers were usually for $5,000, and were usually made to Bank of America and Bank of the West accounts.

---

[6] CHS-1 identified both men by full name, and further identified GUIDRY in a photo lineups prepared by law enforcement, and POWERS by voice based on a voice exemplar from an intercepted call.

Subpoenaed bank information from Bank of America and Bank of the West reveal that CS-1 made deposits into accounts controlled by POWERS and GUIDRY. CS-1 estimated mailing and depositing approximately $200,000 in cash to GUIDRY and POWERS.

32.     CS-1 stated that he had personal knowledge that GUIDRY and POWERS were supplying marijuana to other people in the Kansas City, Missouri, area in a similar fashion, and named several co-conspirators for whom this investigation has revealed other objective information confirming that they also obtained and dealt marijuana from GUIDRY and POWERS. GUIDRY even asked CS-1 for names of other people to recruit into the distribution network, and also explained that he was supplying people in other states.

33.     CS-1 related that at one time, GUIDRY told CS-1 to take possession of a gun from a third party known to both CS-1 and GUIDRY, and to hold onto it in case someone "were to mess with you." CS-1 stated that he did obtain the gun but later sold it.

34.     Between approximately February 2010 and June 2010, the USPIS identified approximately twenty-one suspected bulk cash parcels mailed from Kansas and Missouri to GUIDRY, GUIDRY's wife, and POWERS at various addresses known to be associated with them. One of the parcels sent by CS-1 to GUIDRY was intercepted by law enforcement and found to contain approximately $9,400 in cash.

35.     Between approximately December 2009 and June 2010, the USPIS identified approximately thirty-eight suspected marijuana packages, weighing a gross total of 222 pounds, believed to have been mailed by GUIDRY (using fictitious names and addresses) to Kansas, Missouri, and Georgia. Many of the parcels displayed a sender name and address matching the fictitious name and address that CS-1 recalled GUIDRY using when GUIDRY mailed CS-1

14

packages, and displayed similar handwriting. The parcels were mailed from Post Offices in and around the area of California where GUIDRY and POWERS reside.

36.     Four of the identified packages were intercepted by law enforcement and searched pursuant to search warrant. Approximately thirty pounds of marijuana were seized from those four packages. The marijuana from each of the intercepted parcels was packaged similarly, with names of the strain written in black magic marker on the plastic covering of the pounds of marijuana. One of the packages contained approximately ten pounds, twelve ounces, of marijuana. Latent fingerprints matching those known to belong to GUIDRY and POWERS were found on some of the packages.

       ii.    *Distribution Network in Georgia*

37.     On April 30, 2011, (TT4 #3959) GUIDRY told an unidentified female that he was working with twin brothers in Georgia who are twenty-six years old, which is the age of NATHANIEL and JEREMIAH[7], and work professional jobs in which they earn substantial incomes. Despite their jobs, GUIDRY explained they also sell thirty pounds of marijuana a month, boasting that "selling weed is such an easy job because it sells itself. And the way I do it gets out of here in somebody else's hands, they get rid of it all, and then they just come and bring me the money . . . . You don't have to be a fucking genius to do it."

38.     On April 13, 2011, (TT4 #1894) GUIDRY explained to SAAD that he had twin brothers working for him in Atlanta and that they had been working together for six years. He

said they were coming to visit him between May 11 to 13, 2011, and suggested that SAAD "talk with these guys and you can see what is really going on; you can hear it from the mouth of some youngsters." He also explained a recent trip to Colorado, saying "I bagged twenty-six pounds of weed in less than two hours. I bagged it, boxed it, and it to a UPS in less than two hours. I made thirteen, he made thirteen. I made $1,000 an hour that day."

39.     This last reference by GUIDRY was to a trip he and NATHANIEL made to Denver, Colorado, between April 8 and 9, 2011. On April 9th, physical surveillance was conducted of GUIDRY and NATHANIEL in Denver. NATHANIEL was observed arriving at a hotel and unloading luggage, and he and GUIDRY were later observed loading boxes into a taxi and going to a UPS store where the boxes appeared to be mailed. Law enforcement photographed and videotaped the two at the UPS store, which both men noticed. In later intercepted communications, it was learned that the two had stolen twenty-six pounds of marijuana from a person NATHANIEL knew. For instance, GUIDRY explained to his wife on April 9th that "We did our thing. He grabbed everything. Everything was straight and then we bagged it all up. We took everything out of the room. Even though the room probably stunk up to high heaven. But you know, we had four boxes. Twenty-six of 'em." Later in the conversation, GUIDRY went on to describe seeing that someone was videotaping him and "Nate" at the UPS store.

40.     In another intercepted call on April 9th, (TT4 #1342) GUIDRY also told

---

[7] NATHANIEL was first identified over wire intercepts with GUIDRY as "Nate," and he used a phone subscribed to in his name. He was further identified based on flight records, contemporaneous surveillance, and wire intercepts relating to his trip to Denver, Colorado, with GUIDRY, discussed below. JEREMIAH initially was identified as the sender of an April 22, 2011, USPS package addressed to JOHNSON. The return sender was Jeremiah Wilson at a Pennsylvania residence that JEREMIAH owns. Furthermore, physical surveillance has been conducted of both NATHANIEL and JEREMIAH meeting with GUIDRY at different locations

16

JEREMIAH about the videotaping at the UPS Store:

> GUIDRY: Keep your eyes peeled.

> JEREMIAH: Ok.

> GUIDRY: Everything went cool until the end right towards the fucking end, um, we got everything boxed up and everything and made it to the UPS store . . . . And I'll be damned there is four boxes, your brother went in with two, and when I was getting out to go into the trunk to get the other ones out, um, in the parking spot behind us, um, there is a fucking light Ford Explorer and this motherfucker got a video camera and it was videoing. And I'm like what the fuck is this shit? So your brother went back after I told him what was going on and he went back out with the taxi cab driver and they started walking towards the Explorer . . . he pulled that motherfucker out and turned around and peeled out of there so I don't know what part of the game that was. I would like to think if that was the po po [police] that we wouldn't have made it. Your brother has been on his flight for about 45 minutes . . . .

> . . .

> GUIDRY: That's alright. Nah, I just thought I'd give you a heads up. I know that he [NATHANIEL] did not have time to call nobody. He barely made his flight.

> JEREMIAH: Yea, yea, yea, I knew that. So, um, that's what up. Well, um, well I'll keep my eyes peeled. I mean we all, we all stayed tugged up so . . .

> GUIDRY: You do what?

> JEREMIAH: We all stay tugged, so it's alright.

41.   Based on my training and experience, I know the reference made by JEREMIAH about being "tugged" to mean carrying a firearm.

42.   Law enforcement learned from UPS that the packages GUIDRY and NATHANIEL shipped, the contents of which UPS personnel photographed, did in fact contain approximately twenty-six pounds of marijuana.

---

and in different states.

43.    Based on information learned through intercepted calls, as well as information obtained by administrative subpoena from airlines and online travel services, law enforcement determined that, as GUIDRY told SAAD would happen, NATHANIEL and JEREMIAH flew from Atlanta to San Francisco, California, during the week of May 10th, 2011. On May 13, 2011, law enforcement observed and identified NATHANIEL and JEREMIAH together with GUIDRY and other co-conspirators at a location in Fairfield, California.

44.    The purpose of the trip, among other reasons, is believed to have been for NATHANIEL and JEREMIAH to select marijuana to purchase for shipment back to Atlanta and to bring with them approximately $32,000 in cash obtained from the sale of marijuana owed to GUIDRY. I base this conclusion on my knowledge of the investigation, to include intercepted conversations like that on May 6, 2011, in which GUIDRY spoke with NATHANIEL about the upcoming trip. (TT4 #5010). Their conversation contained some of the following dialogue:

> GUIDRY: Are you bringing the money with you, or are you going to send it back?
>
> NATHANIEL: I'll bring it with me so we can be straight.
>
> GUIDRY: Either way, if it doesn't make it, we just got to make it up. Nothing is gonna change. I think we've been doing this long enough. . . .
>
> NATHANIEL: I'll be coming out Wednesday and Jay and [Name redacted] will be coming out the next day.
>
> . . .
>
> GUIDRY:    We've been waiting a long time for you to get in a position to where we can trade it hand in hand and keep on going . . . . I know where there's seven, so if you want to bring enough for ten, bring enough for ten, but I know where there is seven right now. I know where I can go grab three more Green Cracks. Leave Jay with the 32,000 and tell him to bring the thirty-two.

45.     Based on my training and experience and knowledge of the investigation, I believe that in this call, GUIDRY and NATHANIEL talked about NATHANIEL, his brother JEREMIAH ("Jay"), and another person travelling to California. Further, the discussed plan was for either NATHANIEL or JEREMIAH to bring $32,000 in U.S. currency with them to San Francisco for the purchase of anywhere from seven to ten pounds of marijuana. I further believe GUIDRY referenced his, NATHANIEL, and JEREMIAH's extended relationship in marijuana distribution ("I think we've been doing this long enough.").

46.     In an intercepted call that occurred on May 20, 2011, (TT4 #7708) GUIDRY told NATHANIEL, "I'm heading to the Post Office. I'm sending you seven of them. I'm sending you three-and-a-half [pounds] of those White Grapes, you've seen those. I'm sending you, the White Grapes are twenty-five a piece [$2,500 per pound]. I'm sending you two [pounds] Pineapple Kush . . . and then I'm sending you, ah, one-and-a-half [pounds] of some indoor AK-47 and, so that's it."

      iii.     *Distribution Network in Virginia*

47.     KING lives in Norfolk, Virginia, within the Eastern District of Virginia, and operates a distribution outlet for GUIDRY.[8] As KING told GUIDRY on June 10, 2011, (TT4 #10801), "[T]hey want this Cali weed and they paying for it."

48.     In an intercepted call between GUIDRY and JOHNSON on March 13, 2011, (TT3 #563) they spoke about KING, who had recently moved from a neighborhood in Vallejo, California, called the Crest, to Norfolk, Virginia, to sell marijuana there:

> GUIDRY: Hey ah, I wanna talk to you on the phone so I don't
> hold you up when I see you. Um, what kinda number, and I could

---

[8] In intercepted conversations with GUIDRY, KING was identified as "T.C.", which are his first two initials. Furthermore, the telephone number used by "T.C." is subscribed to in KING's name.

care less what you sell it to the dude in Virginia [CUTRI] for, but what you and him got going ain't got nothing to do with me and you. Um, what can I expect to get from out there?"

JOHNSON: What are you saying you wanna talk about?

GUIDRY I got a partner that lived out in the Crest and he moved out there with his girl. He had a baby and you know he went down there to get away from all this bullshit . . . . What kinda number can I expect to get for pounds out there?

JOHNSON: Ah, you should at least be able to get thirty-eight.

GUIDRY: Damn, that's it?

JOHNSON: Yeah, that's it [UI] thirty-eight. I mean shit it all depends on how many you are dumping cause I don't know right now what he dumps his for is between four and forty-two. That's why I said, you know, thirty-eight.

GUIDRY: At one time wasn't you getting like five or fifty-two or fifty-five from out there at one time?

JOHNSON: Yeah, but that was years ago, ya know. Everybody out there got it, that pretty much what he told me. He is like it's real competitive out there. It's just like out here. So that's why he be so fucking picky cause he like a lot of people out there got Purp and a lot of Kush. They got a lot more Kush then Purp. Then again you know that is a different age bracket dealing with youngsters so.

GUIDRY: Yeah, that's why I was trying to tell you, you see with some of this exotic shit I be having sometimes . . . . Them niggas it's like a breath of fresh air in between the Kushes and the Purples. . . I was just wondering, I told my boy I'm gonna send him a half first and see how he work out with it, and I wanted to see what you know. Hell the first go round I'll give it to him cheap so that he can build up his clienteles . . . .

49.    Based on my training, experience, and knowledge of the investigation, I believe that GUIDRY was asking JOHNSON what GUIDRY can expect KING to charge for a pound of marijuana in Virginia that GUIDRY would send him. When JOHNSON said that GUIDRY could "at least be able to get thirty-eight," JOHNSON was referring to $3,800 per pound of

marijuana. JOHNSON based his estimate on the price that CUTRI had been able to obtain, "between four and forty-two," meaning $4,000 to $4,200.[9] When GUIDRY asked JOHNSON if he previously was getting "five or fifty-two," meaning $5,000 and $5,200, JOHNSON said he did but that was years ago. This indicates that JOHNSON has been distributing marijuana to Virginia for several years, and that GUIDRY was aware of that fact. I further believe that when GUIDRY said he was first going to send KING a "half" for "cheap," meaning a half pound of marijuana, he was explaining that KING could build up his own clientele and then GUIDRY would be able to send additional marijuana for which KING could charge a higher price.

50.    In an intercepted call on April 11, 2011, (TT4 #1565) KING explained to GUIDRY some of the obstacles that he had encountered in trying to set up his marijuana distribution in a city that is new to him:

> KING: Are you gonna listen to me for a minute. It goes slower than on the strip like when I first moved out here I lived on Boardwalk. They got hotels and shit, it goes fast but it's not safe. Now I'm living in an apartment complex now to build cliental. You have to be wise you know what I mean? . . . Then on Virginia Beach Boulevard.
>
> GUIDRY: I said . . . how much you got left?
>
> KING: . . . I got like 1,500 out there tonight (UI). How much I got left, I got enough to last me till Friday. . . . Maybe 1,500 more . . . . I'm on point man. I'm handling my business but you ain't be patient with my situation though. This is a new world out here. I don't know these people. I had to buy a strap and everything. I don't know these people. Then these boys over here that want that shit on Ocean side, I don't have a car to get to them.
>
> GUIDRY: How much money you got?

---

[9] As further described herein, a confidential source, CS-4, participated in a controlled purchase of approximately one pound of marijuana from CUTRI on February 11, 2011, in Fairfax, Virginia. CUTRI charged CS-4 $4,200.

KING: I got like a G easy, like 1,500 more hundred, but I got like 1,500 out there because . . . but I can't get to them boys, that's what you don't understand. I ain't have no transportation. I had to get a strap. I got my strap on me. . . . I'm not smoking nuttin'.

GUIDRY: When you gonna put the rest of that in the mail?

KING: Let me put it in as I get it. This Friday is a military payday and a lot of people are getting paid this Friday you feel me. . . . Virginia Beach, its gonna be booming this summer. I ain't gonna take this shit to the school though. I'll take it to the beach though . . . and I'm right on the beach.

GUIDRY: Take that shit to the college. Let me call you when I'm done doing what I'm doing.

51.     Based on my training and experience, I know the term "strap" to be a term for a firearm, and I further believe KING told GUIDRY he was in possession of a firearm for his safety due to being new to the Virginia Beach area and selling marijuana. A review of KING's criminal history revealed that KING is a convicted felon. KING called GUIDRY back that same day and said he would send GUIDRY "probably about 1,100, 1,200 dollars," which I believe was to pay for marijuana GUIDRY had sent him. (TT4 #1584).

52.     On April 20, 2011 at approximately 8:23 p.m., (TT4 #2810) GUIDRY and KING discussed a marijuana package that GUIDRY had mailed to KING and that GUIDRY believed would be delivered at 10:30 a.m.:

KING: Hey, what's up dog.

GUIDRY: Tomorrow morning at 10:30.

KING: Alright

GUIDRY: Make sure you got somebody there cause a lot of these places don't like leaving it at the door.

KING: I will be there. I am here.

53.    Intercepted calls between GUIDRY and KING from April 21, 2011, demonstrate that KING received the package. For example, during one call that day, GUIDRY asked if KING had "checked it out" and then said, "That is some high dollar shit right there." KING responded "Okay, it is going to go." (TT4 #2842). I believe KING to have been telling GUIDRY that the marijuana would be easy to sell due to the high quality.

54.    Confirming that GUIDRY did in fact send KING a marijuana package, UPS records revealed that a package was mailed from the UPS store in Walnut Creek, California, on April 20, 2011, on which the recipient name and address was "T.C. KING" at "948 TRICE TER APT B, NORFOLK, VA." The city of Walnut Creek, California, is located in the vicinity of GUIDRY's home in Vallejo, California, and GUIDRY has talked about using that particular UPS store in other intercepted calls.

iv.    *Extension of Distribution Network through Watson*

55.    WATSON is a distributor of marijuana for GUIDRY. WATSON currently resides in and around Sacramento, California, but is from Vallejo, California, and specifically identifies himself as being from a neighborhood in that city known as the Crest (where KING is from as well).[10]

56.    On April 5, 2011 at approximately 5:35 p.m., the following conversation occurred between WATSON and GUIDRY, (TT#4 830):

WATSON: Did you ever catch up with [UCC-10]?

---

[10] Local and federal law enforcement officers in Vallejo have informed the investigative team on this case that they know WATSON, that he goes by the nickname "Ju Ju," that he is from and identifies with the "Crest," and that he is a member of a criminal street gang operating in the "Crest" that is called the "Cut Throat Mob." WATSON has identified himself as "Ju Ju" while speaking with GUIDRY. Based on his arrest on June 11, 2011, for a .40-caliber pistol and the recent murder of one of his relatives in Vallejo, both of which incidents are discussed below, it was confirmed that WATSON is the "Ju Ju" who spoke with GUIDRY.

23

> GUIDRY: Yeah. I talked to him, yeah yesterday. I got this other little thing that I'm trying to put together to and um, in Colorado. This dude know somebody in Colorado that's about to start a Cannabis club, but he just wanted to take the dude off. He talking about it would be up to forty pounds. I'm waiting for the dude to call me back with the details. Someone will have to come out there. I told him I know someone that is right in the market to do something like that.
>
> WATSON: Uh huh.
>
> GUIDRY: . . . Dude is cool, but they already got him once.
>
> WATSON: . . . Just let me know.

57.     Based on my training and experience and knowledge of the investigation, I believe GUIDRY was asking WATSON if he would be interested in going to Colorado to steal up to forty pounds of marijuana. Though WATSON replied that he would be interested, I believe that GUIDRY and NATHANIEL ultimately handled the theft on their own, as described above.

58.     The conversation then continued:

> GUIDRY: The thing in Pennsylvania I'm just waiting on um, I'm just waiting on, I got three people I am waiting for money back from and as soon as I get that money our going to be ready to, to, to Pennsylvania, that shit is ready already.
>
> WATSON: Alright. This week or next week.
>
> GUIDRY: As long as we get the money this week we will go this week.

59.     I believe that GUIDRY and WATSON further spoke about WATSON going to Pennsylvania to distribute marijuana from there, and I know from other intercepted calls between WATSON, GUIDRY, and known co-conspirators that GUIDRY plans to utilize a house owned in Pennsylvania by JEREMIAH as a distribution point for his marijuana, based on the residence's proximity to major markets such as New York and surrounding areas.

60.     The conversation continued:

> GUIDRY: All I did was send him those eight, he still working on those eights. He still owe me, seventeen-eight on those . . . .
>
> WATSON: Yeah they gonna be gone though. By tomorrow or Wednesday.
>
> GUIDRY: Yeah that's what he told me . . . . Then you can start dealing with his ass and, uh, I just give you one number for it and you give him another number for it and then everybody's happy.

61.     In this portion of the conversation, I believe that WATSON was asking GUIDRY how one of GUIDRY's distributors, an unindicted co-conspirator, UCC-10, was doing in selling a particular amount of marijuana.

62.     On April 28, 2011, (TT4 #3720) WATSON told GUIDRY that he had just spoken to a cousin in Nebraska about there being a "drought" out there, which I believe to be a reference to a low supply of marijuana in Nebraska. WATSON stated that he wanted to go out there and said he could get a ticket for $250 roundtrip. GUIDRY told WATSON that he had some "Green Crack" and to find out what city in Nebraska. During subsequent calls intercepted between WATSON and GUIDRY, WATSON advised his cousin lived in Omaha. GUIDRY asked how soon WATSON could leave and WATSON said he could be ready to go tomorrow.

63.     In another intercepted call on April 28, 2011, (TT4 #3732) GUIDRY and WATSON continued to talk about WATSON's possible travel to Nebraska to help distribute marijuana. GUIDRY suggested sending a small amount to WATSON's cousin in Nebraska to start the operation: "So what you want to do? You wanna [UI] so I can send like a half a p [pound] or something so he can started?" WATSON responded, "Yeah, that's what we can do. I'm about to get everything I need right now."

64.     In an intercepted call between WATSON and GUIDRY on May 3, 2011, (TT4 #4603) WATSON told GUIDRY the Nebraska plan was cancelled because his cousin got

"caught up with something." WATSON indicated his cousin must have got caught with something "hard" because the cousin didn't want to talk about it over the telephone. Based upon my training and experience, the nature of the call, and knowledge of this investigation, I believe WATSON and GUIDRY's intent to establish themselves in Omaha, Nebraska, was cancelled due to WATSON's relative getting arrested.

65.    In another intercepted call between GUIDRY and WATSON on April 28, 2011, (TT4 #3737) WATSON asked GUIDRY about the price of marijuana: "Do you got some grapes [UI] right now? . . . What's the price on those right now?" GUIDRY responded, "Like $3,000, thirty-one." WATSON, "Ok, I'm fittin' to call my partner right quick and let that nigga know."

66.    In another intercepted call between GUIDRY and WATSON on April 29, 2011, (TT4 #3876) GUIDRY and WATSON discussed potentially growing marijuana plants:

> WATSON: Hey, my sister right, she got ten plants and some grape ape, you feel me but, she don't got the lights and shit. But she want to grow that shit.
>
> GUIDRY: She got what?
>
> WATSON: She got ten plants of grape ape.
>
> GUIDRY: She got some clones?
>
> WATSON: Yeah, she got some baby plants.
>
> GUIDRY: She ain't got no lights?
>
> WATSON: Yeah, she ain't got no light, though.
>
> GUIDRY: Where she gonna grow em at?
>
> WATSON: That's why I was calling and asking you. Do you know somebody, do you know somewhere?
>
> [During the call GUIDRY attempted to make a three-way call to a subject who might be interested in the plants, but there was no answer.]

> GUIDRY: How tall are they?

> WATSON: I don't know, I ain't seen em yet. She just called me right now and I told her I was gonna call my nigga Ant and see did he have somewhere he might want to grow em . . . .

67.   Another intercepted call between WATSON and GUIDRY occurred on June 6, 2011, during which WATSON told GUIDRY about an individual in New York whom they could supply with marijuana for distribution, (TT4 #9897):

> GUIDRY: Ah, it ain't shit. I'm waitin on this dude to call me back. I'm tryin to have him drop me off five of them as soon as I got them in my hand.

> WATSON: Ok, ah, I just talked to my, ah, my boy. He just called me this morning from, ah, from New York. He was like, ah, you want me to fly out there like around, ah, 18th?

> GUIDRY: When the 18th?

> WATSON: Yeah, he said the 18th.

> GUIDRY: I don't know shit, what you want to do? I was just gonna, ah, I was gonna blast him somethin'.

> WATSON: Yeah, no. I'm sayin its good. I said it's good, everything cool. I sayin' he said come out, he told me to come out there on the 18th. But he already know everything, ah, I already told him the date and shit on Thursday he should be, ah, expecting something.

> GUIDRY: Yeah, um, I mean he don't, hell if he come out here on the 18th we can bring our cash back this way if you want to come out here.

> WATSON: No I'm, he want me to come out there where he at on the 18th.

> GUIDRY: Oh, oh, oh, yeah. That can work, yeah. Ah, tomorrow I gonna see if I can get five of them and, um, I was just gonna blast him five of them. What you think?

> WATSON: Blast him five of them? I say my dude been fucking

with me for a while, he say he been fucking with him, so he say
good business but I, I say two.

68.    WATSON texted GUIDRY later on June 6th: "[Redacted address], White Plains,
New York 10603." (TT4 #9876). I believe this is the address WATSON's connection in New
York wanted the marijuana shipped to, and that GUIDRY would have shipped five pounds but
WATSON recommended sending two.

B.    Guidry's Suppliers

69.    This investigation has revealed that GUIDRY has several sources of supply for
marijuana, most of whom grow their own marijuana, and with whom GUIDRY works closely to
ensure that he has access to the highest quality strains.

70.    By way of example, on April 19, 2011, (TT4 #2518) GUIDRY spoke with an
unindicted co-conspirator, UCC-3, who the investigation has shown is one of GUIDRY's sources
of supply for marijuana, but who GUIDRY himself sometimes supplies with marijuana he gets
from other sources:

GUIDRY: What do you got right now?

UCC-3: I don't know what it is. It's some indica, it's some outdoor,
it's fucking, it's ok. It's some decent for some last season outdoor.

GUIDRY: What's the numbers?

UCC-3: Uh, sixteen [$1,600 per pound].

GUIDRY: I got a new dude in North Carolina, and I just got my
foot into Maryland, Baltimore, so I get like forty-two, forty-three
[sells at retail level for $4,200 to $4,300 per pound] for outdoor.

UCC-3: For outdoor, like some of that Super E you showed me?

GUIDRY: Yeah, I mean I pay anywhere between eighteen and two
[$1,800 to $2,000 per pound] for my outdoor.

. . .

28

GUIDRY: If you come up with some good Super 2, it's gotta be some bomb stuff. We'll you've seen my blue dream before.

UCC-3: Yeah I have, it's hella good. I got my shit coming in but that's like a month away. Really the best outdoor I've seen is through you, you know what I mean. And for eighteen I'll fucking grab that shit at eighteen and tell everyone I want twenty-four and I'll just sit on it . . . .

. . .

GUIDRY: I was about to send somebody out to Georgia tomorrow. Let me put this shit together, why don't you call around and see what's out there on the indoor tip . . . .

UCC-3: I know a couple people that got some Super Fire indoor shit but it's not cheap, you know what I mean. They want like fucking club prices, like thirty-two, fucking 3,000.

GUIDRY: But the clubs aren't even getting that anymore

UCC-3: I know.

. . .

GUIDRY: My daughter's got a connection, this lady, she got two different connections. She got one up north and then she's got this other one on an Indian Reservation. I don't have time to just drop everything I'm doing and ride up to Sacramento and then from Sacramento ride another hour or two to this lady at the reservation. I'm not driving off on motherfucking Indian Reservation with no weed. Do you know how big a federal offense that is?

71.   On May 19, 2011, (TT4 #7565) GUIDRY and UCC-3 discussed one of GUIDRY's distributors as an outlet for UCC-3's marijuana. GUIDRY told UCC-3, "Well, if we can keep him because he's got some [marijuana] from you and he's got some from me and he's some from a couple of other people that I'm fucking with. He's actually coming out here to pick up twenty total, ours was just the last five. So, if he likes all of it, and you know I told him, the

stuff if I got from you. . . . [S]o as long as he likes all of this shit, you know you might have a regular outlet for five or ten [pounds] every seven or eight days."

72.    UCC-22 and UCC-23 are growers of marijuana who also supply GUIDRY with high-grade marijuana. UCC-22 and UCC-23 live in a relatively secluded rural area on what appears to be a multi-acre plot of land. Based on toll records and intercepted phone calls, I believe that GUIDRY has been buying marijuana from UCC-22 and UCC-23 since at least 2005. In a call intercepted on April 13, 2011, UCC-23 told GUIDRY "just to let you know, we have four shipments at home." GUIDRY asked UCC-23, "What kind is it?" to which UCC-23 responded, "Ah, we got Green Crack. We got T2, L.A. Confidential, and Sour Diesel Kush."

C.    Guidry's Money Laundering

73.    An intercepted telephone call between GUIDRY and an unindicted co-conspirator, UCC-2, on April 7, 2011, illustrates the national scope of GUIDRY's distribution network and use of bank accounts to launder money. GUIDRY stated, "I can um, you know I can get ten, twenty, thirty pounds just ah, I need you to bring me this and they just drop it off, we'll see you when we see you, you know what I'm saying. . . . Um, I usually, you know, whenever I call somebody I say give me seven to ten days. I know it might be gone in two days, but you never know . . . . The banks ain't fucking with us you know . . . . I done had twelve to fifteen different accounts shut down you know what I'm saying, I don't give a fuck, I just keep opening them up in somebody else's name. . . . You know what's funny, I got one, two, three, four, I got four dudes damn near knocking my door down to give me this shit because they got so much of it. You know what man, 'cause I'm in Texas, Louisiana, Arkansas, Oklahoma, Georgia, two spots in Georgia, uh Pennsylvania, New York, Manhattan, Jersey . . . Well, I'm set up everywhere you know what I'm sayin'." (TT#4 1050).

74.     Law enforcement has identified approximately over twenty bank accounts belonging to GUIDRY. Several of those accounts were opened with financial institutions that have branches located across the country, and to include branches in the Kansas, Missouri, and Georgia, which allows his distributors to make payment directly into his bank accounts.

75.     A review of several bank accounts belonging to GUIDRY revealed that since October 2008 to approximately October 2010, ten of GUIDRY's bank accounts had apparent structured cash deposits (that is, deposits that are consistently just below the $10,000 reporting requirement threshold) totaling approximately $974,886. Cash deposits were made into GUIDRY's accounts in Texas, North Carolina, Florida, Georgia, Arkansas, Kansas, and Missouri. Cash withdrawals from those accounts were made in California.

76.     GUIDRY does not have a legitimate source of income. Through bank records and law enforcement databases, it has been determined that GUIDRY is the owner of a putative company named "Daddy's Girl Handyman," which is based out of GUIDRY's residence. However, physical surveillance has established that there is no work equipment at GUIDRY's residence, nor any vehicles with the company's logo or of the type typically in the home repair industry. A review of records from GUIDRY's personal bank accounts and the company's bank accounts did not reveal withdrawal or deposit activity consistent with an operating handyman service. The only payroll deposits into GUIDRY's bank accounts come from the company 1-800-Flowers, which investigation has revealed is the employer of GUIDRY's wife. Those deposits range in amounts of $1,100 to $1,300 approximately every two weeks, and do not approach the value of the numerous cash deposits and withdrawals in and out of GUIDRY's accounts.

77.     On April 14, 2011, (TT4 #1906) GUIDRY explained his drug trafficking methods to UCC-5 in an effort to recruit UCC-5 as a distribution outlet, during the course of which he said that he receives in the mail between $30,000 to $50,000 drug proceeds every two or three days. GUIDRY said that he has lost in the mail hundreds of thousands of dollars in marijuana and drug proceeds, but that it did not make him "bitter" because he owns three homes.

78.     This investigation has also identified several assets of GUIDRY's, including at least four active bank accounts, two trucks, two motorcycles, three houses, and a boat. GUIDRY explained to SAAD on May 26, 2011, (TT4 #8634) that, at least with respect to one of his houses, he had to put everything in his wife's name so as to avoid scrutiny given his lack of legitimate income: "Did you remember how long it took me to figure out and to maneuver so [GUIDRY's wife] could buy that house in her own name without me? That was so I wouldn't have anything to do with the house."

79.     GUIDRY has frequently discussed his money laundering activities with co-conspirators in intercepted phone calls, often counseling his co-conspirators on how to launder money. For example, on May 27, 2011, (TT4 #8777) GUIDRY asked UCC-3 how UCC-3 wanted to be paid: "Do you have all cash, or can I give you cash and cashier checks so you can put it into your bank." UCC-3 noted that he "prefer[red] cash." However, when GUIDRY told UCC-3 that his Safeway would only give out $2,500 at a time, and further stated that "if they start red flagging me that means I got to start slowing down and if I start slowing me and you have to slow down," UCC-3 agreed to accept money orders.

80.     On May 27, 2011, (TT4 #8769) GUIDRY spoke to an unindicted co-conspirator, UCC-4, and explained that UCC-4 should send payment for marijuana in the form of money orders, stating: "it will speed up the process if, uh, you start turning them into money orders . . .at

the Post Office you can get $1,000 dollar ones." Later, GUIDRY advised, "if you guys go, you can go to two Post Offices. If try to get them all at one Post Office they might want to see your ID. That's no big deal either but still . . . I mean what are they gonna do? All they gonna do is write down who bought the fucking money order."

V.   <u>JOHNSON</u>

81.   JOHNSON resides in Pittsburg, California, and is a wholesale distributor of marijuana to several states, including Virginia, Texas, Florida, Georgia, Louisiana, and North Carolina. The investigation has revealed that GUIDRY taught JOHNSON how to successfully run a marijuana distribution operation, and that JOHNSON looks to GUIDRY as a father figure, often calling him "dad" or "pops". In the intercepted call on April 19, 2011, (TT4 #1906) in which GUIDRY was trying to recruit UCC-5, he referred to JOHNSON, though not by name, and bragged about how he had taught JOHNSON how to conduct business. He explained that he gave JOHNSON "fifteen pounds of weed," put him on a bus to Texas and Louisiana, and told him to "come back with money." Now JOHNSON, who GUIDRY said is twenty-two years old (JOHNSON's age) has "$137,000 in the bank, two cars that are paid for, he just had a baby," and GUIDRY claimed that he continues to handle JOHNSON's finances.

A.   <u>Johnson's Sources of Supply</u>

82.   This investigation has also revealed that JOHNSON has cultivated sources of supply separate from GUIDRY. Monitoring of JOHNSON's wire conversations revealed that he talked to at least three different people from whom he was obtaining marijuana, either directly from growers or from other brokers.

83.     BRIONES is a marijuana grower and one of JOHNSON's regular marijuana suppliers.[11] On March 9, 2011, (TT3 #6) JOHNSON ordered more marijuana from BRIONES after having sold several pounds that BRIONES had supplied him the day before. They further indicated that their relationship goes back at least a year:

> BRIONES: I'm, ah, man playing fucking phone call all these motherfuckers keep telling me to call back later 'cause they working. Ah' I'm, ah, put something together for you. I'm, ah, put something together for you. I'm trying to put together twenty-four of 'em [pounds of marijuana]. I don't know if I will be able to do it.
>
> . . .
>
> JOHNSON: Yeah, yeah, don't rush it as long as I get something today then it's whatever.
>
> BRIONES: You already ran through that from yesterday?
>
> JOHNSON: Nah I'm just trying to . . . I ran through half of it.
>
> BRIONES: Damn like that!
>
> JOHNSON: I ran through half of it. I dumped three [pounds] and the thing of it is I had somebody already waiting that's why I dumped three of them.
>
> BRIONES: You going out of town with it or what?
>
> JOHNSON: Nah, round here is dry.
>
> BRIONES: Last year round this time is when it started pickin' up, but last year it picked up in like February.

Later that same day, BRIONES told JOHNSON that he would have at least ten pounds of marijuana for him the next day. (TT3 #46).

---

[11] BRIONES was identified through wire intercepts of JOHNSON, and through physical surveillance of BRIONES and JOHNSON meeting to conduct drug transactions. During intercepted communications, BRIONES referred to himself as, and was often called by others, "Noe," which is his first name.

84.     I believe that on April 4, 2011, JOHNSON and BRIONES met in person for BRIONES to sell JOHNSON twenty pounds of marijuana. That day, JOHNSON spoke with BRIONES and asked, "How 'bout this? Just bring twenty of those and if I like it, I'll just push it out." (TT3 #5290). Later on, BRIONES told JOHNSON, "I be waiting for you. I got the material in the trunk. All I have to do is give it to you." (TT3 #5295). Subsequently, JOHNSON was observed by law enforcement meeting with BRIONES at BRIONES's residence in Rodeo, California. JOHNSON was observed placing a black plastic garbage bag in his trunk. After he left, JOHNSON and BRIONES had the following conversation, (TT3 #5307):

JOHNSON: I'll definitely be back to get that tomorrow. I looked at that shit in the light and that shit is the truth.

BRIONES: I'm telling you them motherfuckers is nice and you couldn't move that number and honestly I think that is the last of these numbers, too.

. . .

BRIONES: Man, you got somebody following you?

JOHNSON: No

BRIONES: You ain't got no Jeep following you?

JOHNSON: I ain't got nobody following me

. . .

BRIONES: Alright

JOHNSON: No, I came solo. I don't come with nobody, shit, 'cause I know when you come see me you don't come with nobody. . . . I trust you, like the first time I met you, you brought a thing, and after that you didn't have to bring it no more.

BRIONES:     Exactly, alright I'll holla at you later then.

85.    Based on my training and experience, I believe that in this conversation, JOHNSON told BRIONES that the marijuana that BRIONES had supplied to JOHNSON appeared to be high quality when JOHNSON had viewed it in the light. When BRIONES questioned whether JOHNSON brought someone with him, JOHNSON denied having done so and reminded BRIONES that they trust one another and do not have to be armed when they meet one another. In particular, JOHNSON said that BRIONES only brought "a thing," which I believe to mean a firearm, to their first meeting.

86.    On April 22, 2011, (TT5 #511)JOHNSON and BRIONES again discussed the purchase of multiple pounds of marijuana:

> BRIONES: You gonna want to do something tomorrow or what? . . . What you thinking roughly? So I can be ready for you because I got some people trimming [marijuana plants] right now.
>
> JOHNSON: What you got right now?
>
> BRIONES: It's four New York Diesels, I got eight regular Sour Diesels, which ain't regular, it's just a difference than Sour Diesels. I got three Chem Dogs, five Blue Dreams. I got about a twenty, about twenty put together.
>
> JOHNSON: Ok, well shit: 20 to 25 [pounds].
>
> BRIONES: It's all good. You want to do it Sunday then for sure?
>
> JOHNSON: Yeah, Sunday for sure.

87.    During another intercepted call between JOHNSON and BRIONES on April 25, 2011, (TT#5 632) BRIONES and JOHNSON talk about prices and BRIONES refers to supplying wholesale marijuana to other people who are shipping it to other states for retail distribution:

> BRIONES: What number did we talk about? I don't even remember.
>
> JOHNSON: Shit you was like, you told me twenty-six but you were trying for twenty-five [$2,500 per pound]. But you was like

36

you didn't know, it all depending on what I was wrapping. I told you I could work anywhere between 25 and 30 [pounds] of them.

BRIONES: The thing is right now this was right here was my bud's shit, and then some of them Diesels are mine. But these, these right here I was sending out of state but I got them for you 'cause man all the same motherfuckers that I'm fucking with right now they send out. I'm dumping them for twenty-eight [$2,800 per pound], they are dumping them for forty-five [$4,500 per pound]. . . . So you know that's where the price is cause even my [UI], he been trying to send most of the work out of town. But man that out of town shit, it ain't always sure.

88.    BRIONES has other suppliers from whom he purchases marijuana plants, including UCC-6, who he spoke with on April 5, 2011, (TT5 #78) in detail about BRIONES having ordered 250 plants from UCC-6:

BRIONES: What we got?

UCC-6: I got an inventory average about eight inches, look like a couple of those SSD's [marijuana strain]. I still have those, they are starting to push out a little bit. So there's, all in all that I got it's gonna be the right size, sum total 193. So a couple ways to do that: I mean, if want to go ahead and fill the order with what's there, I can go through the inventory and pick that way, or I can take the ones that look the best or the biggest.

BRIONES: What are you going to be missing? Lavs [marijuana strain]?

UCC-6: No. Basically the other order you did, all the Purple Cheese [marijuana strain] guys, the fifty SSD's are still there, and the lavenders look shitty. They don't look good enough to transplant. They are beat up.

BRIONES: Like the way you gave it to me last time? So what do you have right now? I am gonna have to go somewhere else just to order a couple extra hundred cause I know you are not going to be ready for what I need. What you have that's gonna make it in large quantities? How much can you ready for me because I am going to have to call someone else to put another order in. You are not going to have the 250.

37

89.     BRIONES has other people who he works with to grow and cultivate marijuana, including UCC-15, whom he spoke with on April 23, 2011, (TT5 #576) concerning caring for marijuana plants:

> UCC-15: Na, they all done they look good. I left them, too, like, ah, half on top like you said.
>
> BRIONES: Hey that's good, that just creates humidity so it keeps it nice and humid in there.
>
> UCC-15: Yeah, I sprayed the tops like three times. I sprayed them once at the beginning, then I watered one tray, and I sprayed them again, um, and then I watered the other tray and I sprayed them again. So they should have plenty of water.
>
> BRIONES: What's the temperature in there, did you check?
>
> UCC-15: Eight-six.
>
> BRIONES: Did you check the humidity?
>
> UCC-15: No I didn't check that. It felt cool though.

90.     BRIONES and UCC-15 spoke again on April 24, 2011, (TT5 #615) about tending to the marijuana plants:

> UCC-15: Yeah I sent you a text cause I didn't know if you were gonna go water or if it was cool until tomorrow when we go.
>
> BRIONES: Yeah, no we should be good until tomorrow morning. You left water in there right?
>
> UCC-15: Yeah I left them like half an inch on top, like you told me. Then I squirted the hell out of them on top.
>
> BRIONES: You, you gave each one with the water, right? The water though, right?
>
> UCC-15: Yeah, like you showed me. I let them, I let them run like three seconds on each one on each of the cube and then I left the water half.

38

> BRIONES: Alright, yeah, that's cool. What was I going to tell you, um? Yeah, we'll just go tomorrow morning.
>
> UCC-15: Alright, cool. Those girls are there too if you want to come check them out.
>
> BRIONES: How do they look dude? The fucker is calling me, fuck.
>
> UCC-15: They look cool, they look nice. Like I said if you don't wanna do those I got the Purple ones sitting there too.

91. During the course of the investigation, it was learned that BRIONES rents a home near Sacramento, California, that he refers to as "the ranch" and where he is believed to be running a marijuana grow operation with UCC-15. Law enforcement has identified this residence and surveilled BRIONES's vehicle there.

92. Furthermore, while intercepting BRIONES's telephone, he arranged to pay several thousand dollars to "coyotes" in Mexico to smuggle a person, UCC-27, from Mexico into the United States so that person could work at "the ranch" for BRIONES. One coyote told BRIONES on April 21, 2011, (TT5 #440) that it would cost $5,500 to get UCC-27 to Los Angeles and $5,800 to get him to Sacramento. The coyote further explained that they would pay a border guard $2,500 to help get UCC-27 across. UCC-27's first effort to make it across the border, which occurred while law enforcement was still intercepting BRIONES's telephone, was unsuccessful. Because monitoring of BRIONES's telephone ceased on April 26, 2011, it is not known whether UCC-27 tried again and is now in the United States. BRIONES has family and associates in Mexico who were helping to facilitate the smuggling conspiracy, and thus I believe they could provide shelter and assistance to BRIONES were he to decide to flee the country to avoid prosecution for his involvement in the conspiracy.

B.    Johnson's Distribution Networks

93.    This investigation has revealed that JOHNSON has several distribution outlets across the United States.[12] One of those outlets is UCC-7, who resides in Atlanta, Georgia, and who JOHNSON speaks with often over the phone about marijuana distribution. For example, on March 28, 2011, (TT3 #2141) the two spoke and their conversation contained some of the following dialogue:

> JOHNSON: I was about to say nigga, uh, if you [UI] some dark nigga, if ah, if you know somebody that wants to buy that mothafucka for sixteen, go on and dump it. I'll run you another one. I bought a lot of it. I'm waitin' on you my nigga. That bitch is the truth. I'm just sayin' if somebody want to buy the whole thing, go on and dump . . . .
>
> UCC-7: Ok, definitely. 'Cause yeah man, (UI) that, that the one recently and that had everybody goin' crazy. They still talkin' about it.
>
> JOHNSON: Yeah, man. Don't be scared, go on and dump that bitch (UI) I'll hit ya back ASAP.
>
> UCC-7: Ok, ok.
>
> JOHNSON: Hey I know you don't want me, see this shit go fast with niggas, somebody want it bro (UI) give it to 'em. I gotcha. All you gotta do is let me know (UI) real quick, you know what I'm saying. And I get it to ya ASAP.
>
> UCC-7: Yeah, the thing with that, I just don't want to you know, I don't want to take no L [loss]. I don't even want to take that you know . . . (UI). With that, that one you just sent man, that shit crazy. They still talkin' about it. They just like, shit blowin' niggas' minds.
>
> JOHNSON: He think funny minds nigga, this is gonna blow their socks off.

---

[12] JOHNSON was identified through various ways in this investigation, to include that Target Telephone #3 is subscribed in his name and is listed on bank records associated with JOHNSON, he was frequently intercepted over his telephone and others self identifying himself, and physical surveillance of JOHNSON corroborated the substance of many intercepted telephone calls.

UCC-7: Is it some Grape?

JOHNSON: Yeah nigga, it's dark [referring to color of marijuana].

94.    Of all JOHNSONS's distribution outlets, the investigation has revealed that his largest in terms of pounds of marijuana, and most lucrative in terms of proceeds generated, is run by CUTRI in the Eastern District of Virginia. As JOHNSON explained on March 13, 2011, (TT3 #563) when GUIDRY asked how much he and KING could expect to get per pound of marijuana in Virginia, JOHNSON has been dealing with CUTRI "for years." And on April 18, 2011, (TT3 #6342) while talking to UCC-26 about how much he trusts his girlfriend, PATINO, when it comes to his marijuana distribution, JOHNSON said that his "nigga from DC" [CUTRI] told PATINO that he had been "fucking with" JOHNSON [dealing marijuana] for "five years strong."

95.    While CUTRI and certain of his Virginia-based distributors are discussed in more detail below, the following incident captures how his distribution outlet operates to sell marijuana sent to them by JOHNSON.

96.    In March 2011, CUTRI traveled to San Francisco, California, where he obtained marijuana from JOHNSON (who in turn obtained the marijuana from BRIONES) and sent it back to locations in West Virginia and Virginia. NAHOM and YONATA coordinated the deliveries by providing addresses to CUTRI and conducting surveillance on those addresses to facilitate the safe delivery of the marijuana.

97.    Intercepted calls between CUTRI and JOHNSON reveal that on March 6, 2011, CUTRI traveled to California and that JOHNSON picked him up at the airport. Surveillance on March 10, 2011, observed CUTRI and JOHNSON together in California.

98.     Based on my training, experience, and knowledge of this case, I believe that while CUTRI was in California, JOHNSON obtained marijuana from BRIONES, which he supplied to CUTRI. On March 12, 2011, (TT3 #386) while CUTRI was still in California, JOHNSON spoke with BRIONES about how many pounds of marijuana JOHNSON had purchased from BRIONES during that week:

> JOHNSON: Hey, how many did I buy from you this week total?
>
> BRIONES: Ah, I don't know
>
> JOHNSON: I bought twenty-eight. Fuck, did I leave one lying around somewhere?
>
> BRIONES: Nah, twenty-eight. You bought eight the first day, a ten-pack of the dark ones and the ten yesterday.
>
> JOHNSON: Fuck, I must of dropped some somewhere 'cause I can't find the last one. I got twenty-seven, and I ain't got twenty-eight.

99.     I believe that CUTRI and JOHNSON sent the marijuana purchased from BRIONES to four addresses in West Virginia and Virginia that were provided to him by NAHOM. On March 12, 2011, (TT2 #306) CUTRI called NAHOM and had the following conversation:

> CUTRI: I need them joints whenever you get them off tomorrow.
>
> HAGOS: Alright I'm going to talk to you right now. Hey, three?
>
> CUTRI: Nah, four. . . . You want to do 3 W's?
>
> HAGOS: I'll do 3 W's and 1 Richmond.

100.    Immediately following that conversation, CUTRI received an incoming text message from NAHOM with four street addresses, three located in West Virginia and one located in Richmond. (TT2 #307). Then a short time later, YONATA called CUTRI and

provided him with an address in Lorton, Virginia, to use as well. Based on my training and experience, I believe that NAHOM and YONATA provided CUTRI with five addresses to which he could send marijuana via the mail that they all could then distribute.

101.   Law enforcement determined the unique tracking number for the package destined for the address in Richmond, Virginia, which was provided to USPS Inspectors. The package was intercepted and searched pursuant to search warrant. Inside was approximately five pounds, four ounces, of marijuana.

102.   On March 14, 2011, law enforcement established physical surveillance on each of the remaining address where the packages were to be shipped. Law enforcement officers conducting the surveillance identified NAHOM at one of the addresses in West Virginia where a package was delivered.

103.   Intercepted communications on CUTRI's phone indicate that YONATA was present and conducting counter-surveillance at the address in Lorton, Virginia, and in doing so identified law enforcement officers who were surveilling the area. Specifically, in an early afternoon call to CUTRI, YONATA said he believed police were in the area, (TT2 #381):

> CUTRI: Yeah it's probably straight, it's probably straight dog. Just don't, don't freak out.
>
> YONATA: I mean, I mean.
>
> CUTRI: You know what? Like nigger, just let them, just let them come in and just put it down. You know what I'm sayin'.
>
> YONATA: Ok.
>
> CUTRI: You know what I'm sayin'. If they come put it down, just grab it and put it in the crib. Just don't open it, you know what I'm sayin'. Just leave everybody. Just leave the crib, just leave it in the crib. Everybody just leave it there uncracked and everything.

104.    Based on my training and experience, I believe that CUTRI was advising

YONATA not to open the delivered package if he believed law enforcement was present, but to

leave the area instead.

C.    Patino Helps Johnson Supply Drug Trafficking Networks

105.    PATINO is JOHNON's live-in girlfriend and the investigation has established

that PATINO is actively involved in the coordination and wholesale distribution of marijuana

with JOHNSON.[13] In March 2011, she gave birth to their first child. While still in the hospital,

she called JOHNSON and asked what he was doing. He responded that he was "putting this little

pack together real quick," which I know to be a marijuana package. PATINO reminded

JOHNSON to "make sure you wash and stuff before you come back." She reiterated, "Wash up

your arms and your face and stuff, so you don't come in here [the hospital] stinking." (TT#3

1332).

106.    On April 8, 2011, (TT#3 5594) PATINO distributed three pounds of marijuana to

GUIDRY at JOHNSON's request. In the early afternoon of that day, JOHNSON told GUIDRY

that PATINO had marijuana available for GUIDRY:

> JOHNSON: She's setting them out for you.
>
> GUIDRY: Ok. Ah, you still want me to call you when I'm coming
> that way?
>
> JOHNSON: Uh, no you can call her. Unless you need the supplies
> and everything, or are you gonna bring your own?
>
> GUIDRY: No, I'm just gonna grab them up and go back to the
> house and um . . .
>
> JOHNSON: Oh . . .

---

[13] PATINO was identified in the investigation through JOHNSON's toll records, as she is the
subscriber of the intercepted telephone. Her name is commonly used during calls and text
messages, and she has been identified through physical surveillance and financial documents.

GUIDRY: . . . get them all together and get them in the mail before I leave.

JOHNSON: Ok, same number as last time or something different?

GUIDRY: Um, gotta think. Give me, ah, one second, let me think about where they going first. Um [UI], one I sent to [UI] too, he's looking for some Kush. What is, is it a Granddaddy again?

JOHNSON: Yeah.

GUIDRY: How many of them is there?

JOHNSON: Three.

107.   Immediately afterward, JOHNSON called PATINO (TT#3, 5595):

PATINO: Hello

JOHNSON: Hey, he not gonna do it over there, so just give him the three. He, um, do it at his house he said.

PATINO: Um, where's he at?

JOHNSON: Ah, I think he'll call you when he close by.

PATINO: Ok.

JOHNSON: Just, uh, take them out of the closet now, and just put them in the room or something.

PATINO: What you want me to put them in, just the bag still?

JOHNSON: Uh, no go get a trash bag from down stairs, a trash bag. Get one black trash bag in the garage. Just put them in that and give it to him.

PATINO: Ok

108.   PATINO and JOHNSON spoke again a short time later (TT#3, 5601):

PATINO: You said in the black Nike bag, there's no black Nike bag in the back, in the, in my storage.

JOHNSON: It must be under the table then.

45

PATINO: Oh, shit, ok.

JOHNSON:Is he there?

PATINO: No he's not here yet.

. . .

PATINO: I looked, there's no Nike bag, what color is the Nike bag?

JOHNSON: Green and grey

PATINO: I didn't see no green, hold on, put the baby down real quick. Hold on, stay right there for a second. I didn't see no green Nike, hold on. [Sounds of PATINO opening doors and going into the storage closet] That's 'cause it's not a Nike bag, it's a Spaulding bag. I'm looking for a Nike bag.

JOHNSON: Oh yeah, and can you get $3400 out of my box, my grey cabinet.

PATINO: So I'm getting just three full bags out of here, right?

JOHNSON: Yeah.

PATINO: You got a garbage bag right here. It's all gonna be in this garbage bag.

JOHNSON: Yeah, put three and $3,400 out of my box.

PATINO: One, the, are they all the same?

JOHNSON: Yeah, they all the same. Just get three, and $3,400 out of that box.

PATINO: Out of what box?

JOHNSON: You know my grey bin in my closet?

PATINO: Aw, just had to leave that in there 'cause it smells.

JOHNSON: My grey bin in my closet. In a Jordan.

PATINO: I'm looking right now, hold on.

46

JOHNSON: In the Jordan box, there's some cash in there. Give him $3,400.

PATINO: Um, ok is it in the grey bin?

JOHNSON: Yeah, my closet.

PATINO: Storage box, give him how much?

JOHNSON: $3,400. You got to count it out for him, give it to him, and put the rest back.

109.   After a series of text messages between JOHNSON and GUIDRY, and JOHNSON and PATINO, PATINO and JOHNSON spoke. When he asked, "Did he come down there?" PATINO responded, "Yeah, he already left." (TT3 #5616). Based on his training and experience, and knowledge of the case, your affiant believes that PATINO confirmed with JOHNSON that GUIDRY had arrived, picked up the three pounds of marijuana and money, and departed.

110.   A review of intercepted calls indicates that PATINO is involved in preparing packages of marijuana to be shipped out to JOHNSON's distribution outlets. For example, on May 3, 2011, (TT#3 7803) she and JOHNSON had the following conversation:

PATINO: . . . and, um, the stuff is downstairs in that black duffle bag again right?

JOHNSON: Yeah, uh, it's uh, two big ones and one small one.

PATINO: Oh, ok.

JOHNSON: If you have time to wrap all of them, do it. But I'm pretty sure you won't. I just need, two. I just need two big ones and a little one wrapped.

PATINO: Ok, no problem.

JOHNSON: The smallest one that is in there.

PATINO: Oh, ok.

JOHNSON: Just call me.

111.    Based on my knowledge of the case, training and experience, you affiant believes

that in this conversation, JOHNSON was asking PATINO to wrap three packages of marijuana

for him so that they were ready to be sent out by common carrier. Your affiant believes that

PATINO's question about "the stuff" being "downstairs in that black duffle bag again" indicates

that they (JOHNSON and PATINO) store marijuana in their home, and that this is not the first

time that PATINO has been involved in preparing packages of marijuana to be sent out to

customers.

112.    Based on a review of intercepted telephone calls, your affiant believes that, in

addition to wrapping up packages, PATINO is also involved in filling out labels used to send

packages to customers via common carriers. This conclusion is drawn from, among other things,

a call intercepted on April 29, 2011, (TT#3 7490):

JOHNSON: Alright, you can fill out one of those slips for me?

PATINO: Which one?

JOHNSON: 'Bout to text it to you. Um, on it put, put, uh, my old
apartment.

PATINO: Ok.

JOHNSON: The one I used to stay in, alright.

PATINO: Yeah, I know.

JOHNSON: Alright and leave . . .

PATINO: I know. I'm asking you what paper do I fill out, the one
that I usually always fill out, or . . .

JOHNSON: Yeah, one of them slips.

PATINO: Ok.

JOHNSON: Uh, they should be some downstairs by the sugar.

113.    Your affiant believes that in this call JOHNSON is asking PATINO to fill out labels he intends to use to send out packages of marijuana to his distribution outlets. In this call, PATINO asked JOHNSON if she should use "the one that I usually always fill out" and your affiant believes this indicates that PATINO frequently fills out labels for marijuana packages. Immediately following this conversation, JOHNSON texted two addresses to PATINO, one in North Carolina, and one in Texas. Both of these addresses are known to your affiant as being associated with distribution outlets of JOHNSON (TT#3 4464 & 4753).

D.    Johnson's Money Laundering

114.    This investigation revealed that JOHNSON had three accounts with Bank of America. Upon reviewing bank records of those accounts, it was determined that the amount deposited into two of the accounts from May 2009 through May 2010 was approximately $598,765, consisting of 198 separate cash deposits in eight different states, including Virginia, with never more than $8,000 deposited at one time.[14] I believe that the majority of these deposits represent payments to JOHNSON by customers to whom JOHNSON had sent marijuana. There were multiple deposits at different branches on one day; multiple deposits at the same branch in successive days; and two deposits at the same branch on the same day into separate accounts. The majority of withdrawals from the accounts occurred in California. JOHNSON's bank records revealed that some of the bank accounts appear to be "pass through" accounts in that the

---

[14] Based on my training and experience, I know financial intuitions complete currency transaction reports on deposits of $10,000 or more, and that subjects involved in money laundering and the distribution of controlled substances are aware of the reporting requirement and commonly make deposits under $10,000 to try and avoid the documentation of such deposits.

out of state cash deposits are made into the account and either the full dollar amount of the deposit or a similar amount is withdrawn within a short time of the deposit being made, leaving minimal balance in the accounts. Recently, through intercepts of wire and electronic communications, there have also been additional accounts identified with $20,000 to $30,000 balances into which JOHNSON has been having customers make deposits.

115.    Law enforcement obtained video surveillance, via subpoena, of numerous cash deposits made into, and cash withdrawals made out of, JOHNSON's bank accounts. In several of the surveillance photographs, co-conspirators, to include CUTRI and MASOUD, were identified making the deposits, while JOHNSON was identified as making the cash withdrawals.

116.    The investigation has revealed JOHNSON is employed at a company called "Futures Explored" in Antioch, California. A review of subpoenaed bank accounts revealed regular direct deposits from "Futures Explored" of between $500 to $800 approximately every two weeks into JOHNSON's account. The investigation has not revealed any other legitimate reason for the cash deposits from many people across several states into JOHNSON's bank accounts.

117.    An intercepted call between JOHNSON and BRIONES on April 9, 2011, (TT#3 5703) described how JOHNSON was looking for a new job to legitimize his income so he could buy a house:

> JOHNSON: You know anybody work at the, ah, Richmond, ah, Richmond, ah, trash company?
>
> BRIONES: . . . I think that I actually might. What do you need?
>
> JOHNSON: You think if I throw them some money they can give me a job there? . . .

50

BRIONES: Alright, look. My, my, boy's wife she works there. I don't know what she does. I think she does, ah, what the fuck they call that shit? She work up at the dump. You trying to get on as a driver?

JOHNSON: Nah, I just need a better job man. I'm trying to buy a house and I need a lot more money on paper.

118.    JOHNSON also outlined the goal of his drug trafficking and drug profits during a

call with an unidentified co-conspirator, UCC-21, on April 2, 2011, (TT#3 5037):

JOHNSON: Shit if I could, yeah, if I could have half a mil you know, at least, half. If I ain't, if I ain't got half, I wanna at least have 400,000, you know?

UCC-21: Where you at now?

JOHNSON: I think like maybe 192, 3. [$192,000 or $193,000]

UCC-21: Are you kidding bro? You gotta keep doing what you're doing.

JOHNSON: Yeah, if I keep going. But shit, it's like shit, you know, this week I had a pretty good week outside of work I had a pretty good week so, who knows, who knows.

119.    An intercepted call between GUIDRY and JOHNSON on June 4, 2011, (TT4

#9725) illustrates that GUIDRY advises JOHNSON on how to launder and manage his drug

proceeds:

GUIDRY: Personally, I wouldn't keep no whole lot of money in the fucking bank. I would slowly over the course over the next couple of weeks, I'd slowly draw that shit out 'cause, um, you know until you find out what's going on [a reference to recent cash and marijuana interceptions by law enforcement] I wouldn't just have that shit just sitting in the bank.

JOHNSON: Ok.

GUIDRY: I mean don't nobody know what's going on, you know. Look how sporadic this shit is. You get a few packages, then you lose a package all of sudden. You done got a few packages and it's like I said, um, you know I asked you, ah, was the priority done

overnight . . . . Yeah, I would, ah, I would go deposit it into your
business account and then turn them into some cashier's checks
and then go cash the cashier's checks at different banks.

120.    On April 11, 2011, law enforcement learned through interception of wire

communications that CUTRI was planning on sending JOHNSON approximately $26,000 in

marijuana proceeds through the mail. Law enforcement surveilled CUTRI going to the Post

Office in Springfield, Virginia, that day, where he dropped off a package addressed to

JOHNSON at an address in Antioch, California, known to be the residence of JOHNSON's

grandmother. A certified narcotic detection canine alerted to the presence of narcotics on the

package. A search warrant was executed on the intercepted package the next day, revealing

$26,080 in cash.

121.    Previously, on or about February 16, 2011, the USPS intercepted a package

addressed to JOHNSON at a P.O. Box in Pittsburg, California, that is registered to his name, and

which address JOHNSON refers to when speaking with co-conspirators on the phone. A canine

trained to detect the scent of narcotics examined the parcel and detected the scent of narcotics

coming from the package. The package was searched pursuant to a search warrant and found to

contain $32,480 in cash. CUTRI sent the package, as he reached out to and spoke with a

representative from the USPS Consumer Affairs Office, though he used a pseudonym and did

not reveal the contents.

122.    The conversation was intercepted on February 25, 2011. CUTRI said, "That's

fine. It was uh, kinda expensive present for uh . . . I guess I should have gotten insurance on it. It

was actually the second time this happened. Uh, I've sent like overnight packages and yeah, just

haven't arrived." The USPS employee asked if it was the same address and CUTRI said, "No,

Not this same address. But to California though. To uh, I sent one to my cousin in San Francisco

one time and it got lost and then this time I guess I sent it to, uh, that ,that Pittsburg and I don't know. For some reason I don't know. Both times when I did it, um, I'm tryin' to figure out like why they get lost when it gets over there. Both times when I did it, it was raining over there. Do you think rain has anything to do with it?" (TT2 #22).

123.    In a later-intercepted wire conversation on April 20, 2011, GUIDRY recounted to UCC-22 that "Justin" had $26,000 stolen/lost in the mail one week and around $33,000 stolen/lost before that. (TT4 #2744).

E.    Johnson, Guidry, and Cutri Use Solorio for Bulk Cash Smuggling

124.    SOLORIO is believed to be GUIDRY's adult daughter or stepdaughter. In a call on April 30, 2011, GUIDRY told an unidentified co-conspirator, "I don't know if you ever met my oldest daughter Tiffany [SOLORIO] . . . She does a lot of work for me, for Justin [JOHNSON], and for the twins [NATHANIEL and JEREMIAH]. She flies all over the place and all she does is pick up money and bring it from one spot to another. . . . She gets anywhere from 500 bucks to a thousand bucks for making a trip. She flew to Georgia last week. She went and picked up $60,000, and she got paid $1,000." (TT4 #3959).

125.    The reference to SOLORIO working for JOHNSON came about because of the above-described law enforcement seizures of the two money packages that CUTRI attempted to send to JOHNSON. Based on intercepted telephone calls over JOHNSON and GUIDRY's lines, it was learned that JOHNSON told GUIDRY what had happened with the money and GUIDRY suggested he hire SOLORIO to fly from Sacramento, California, to collect marijuana proceeds from CUTRI and return with the currency to California. JOHNSON did so and SOLORIO agreed to make the trip.

126.   On April 20, 2011, GUIDRY prepared SOLORIO for the trip by telling her, "Whenever you go, be careful, especially carrying that much money. The best way to do it is, if you got a backpack, put it in your backpack, and break it down into like three stacks, and lay it in your backpack sideways, so when you lay your backpack down, however you lay it down, if you laid it back down, the money should be standing on an angle, so when they look at it, it looks like the pages from a book. That's what we normally do. But, if anything ever happens, whether it be this trip or any other trip, just tell them that, uh, you know, you went out there, and you went gambling, and you won . . . ." (TT4 #2711).

127.   On April 22, 2011, JOHNSON and SOLORIO had a conversation that included the following, (TT3 #6637):

> JOHNSON: He [CUTRI] was telling me that they're not hundreds, is that a problem or no? They're mostly singles.
>
> SOLORIO: That's gonna be a hell of bills. Did you tell my dad?
>
> JOHNSON: Yeah, I told him. He said cool, that you did it before.
>
> SOLORIO: I didn't go through the money so I didn't know.
>
> JOHNSON: He was telling me that it's real heavy.
>
> SOLORIO: It should be fine. I just pack like a sweater in there, one outfit, and books. That it.
>
> JOHNSON: Ok because he was freaking out.
>
> SOLORIO: Anyway, I already know what to say if they go through it or something.
>
> JOHNSON: I know you know what to do. He just called me freaking out.
>
> SOLOROIO: Tell him to chill. Everything is on schedule for tomorrow. I printed my tickets and everything.

JOHNSON: I'll see you tomorrow then. I'll call you with the details tonight.

128.   On April 23, 2011, law enforcement surveillance observed SOLORIO exit a passenger airliner and enter Washington Dulles International Airport, within the Eastern District of Virginia. SOLORIO was observed carrying a backpack. SOLORIO exited the airport and got into a vehicle driven by CUTRI in the passenger pick-up/drop off area. CUTRI and SOLORIO drove away from the terminal and returned a short time later. SOLORIO exited CUTRI's vehicle and proceeded to board her return flight to Sacramento, California. Based on intercepted calls, it was believed SOLORIO collected between $50,000 to $60,000 from CUTRI on behalf of JOHNSON.

129.   Based on intercepted telephone calls over JOHNSON and GUIDRY's lines, it was learned that SOLORIO was planning a return trip to Virginia in May to collect more drug currency from CUTRI on JOHNSON's behalf. For example, on May 1, 2011, (TT3 #7682) JOHNSON told SOLORIO, "Um I talked to him or whatever but he was trying to get some more shit together. I know for sure going this week. I'm not sure exactly what day so that why I don't want to buy the ticket just yet. But it's a sure thing. I just need to know how much he will end up having." SOLORIO asked, "Like this weekend?" and JOHNSON responded, "Yeah."

130.   Unbeknownst to JOHNSON, GUIDRY and SOLORIO planned to steal the drug proceeds SOLORIO picked up from CUTRI by pretending that law enforcement found and seized the money in her bag. The motivation for their plan was that SOLORIO and GUIDRY felt JOHNSON had not paid SOLORIO enough for her trip to Virginia on April 23rd. As GUIDRY explained the plan to SOLORIO on April 26, 2011, "Make it look like you missed the [return] flight. So you might have to stay out there a little bit longer. But, ah, you'll miss the flight, call him, and tell him they confiscated it. You missed your flight and they put you on the next flight.

Then they took all your information and you'll be getting something in the mail because it's been forfeited." (TT4 #3327).

131.    On May 10, 2011, physical surveillance observed SOLORIO exit a passenger airliner and enter Washington Dulles International Airport, within the Eastern District of Virginia. SOLORIO was observed getting into a vehicle driven by CUTRI at the passenger pick-up/drop off area. CUTRI and SOLORIO were observed driving away from the terminal area. A short time later, SOLORIO was observed back inside the airport. After going through the TSA screening area, SOLORIO was approached by Metropolitan Washington Airport Authority ("MWAA") Detectives who asked SOLORIO if they could search her bag. SOLORIO gave her consent. Her bag contained approximately $69,940 in cash and USPS money orders. A certified narcotics trained canine alerted to the presence of narcotics on the bag.

132.    In an intercepted call on May 10th, SOLORIO (speaking from the security area in Dulles) told GUIDRY that she was stopped on the way home. SOLORIO said, "They are trying to tell me that bag that I used . . . says that their dog is picking up drugs on it." (TT4 #5558). In a later follow-up conversation, SOLORIO told GUIDRY that "some undercover guys" took the bag. GUIDRY told SOLORIO "Alright, go into your phone, delete the email that I sent you, delete any texts that I sent you." GUIDRY then instructed SOLORIO to call her back. (TT4 #5561). In a later call, after SOLORIO provided GUIDRY with additional details about her encounter with law enforcement, GUIDRY asked her, "Did you delete the stuff I told you to?" and SOLORIO responded "Yeah." (TT4 #5565).

133.    Since law enforcement seized the proceeds from SOLORIO, she, GUIDRY, and JOHNSON have made repeated efforts to get the money back by contacting MWAA officers and falsely claiming the source of the funds to be legitimate.

VI.   <u>CUTRI</u>

134.   CUTRI is JOHNSON's primary distribution outlet of marijuana, and YONATA, NAHOM, and MASOUD work for CUTRI. The January 2010 arrest and ensuing investigation of MASOUD by local law enforcement in Alexandria, Virginia, within the Eastern District of Virginia, contributed to the initiation of this investigation.

A.   <u>Masoud Arrest and Conviction</u>

135.   On January 12, 2010, MASOUD was arrested in Alexandria, Virginia, for possessing with the intent to distribute over two pounds of marijuana that was found by law enforcement in a motel room MASOUD had rented. MASOUD's fingerprints were identified on empty bags found near where the marijuana was also located.

136.   MASOUD initially was detained in jail. Between January 13 and 14, 2010, he made several telephone calls from jail to his girlfriend, UCC-11. He instructed UCC-11 to continue his marijuana dealing operation while he was incarcerated, specifying from whom debts should be collected and that the money should be gathered and sent to CUTRI. At one point, UCC-11, CUTRI, and MASOUD had a three-way phone conversation in which CUTRI agreed to help UCC-11 continue MASOUD's marijuana operation. UCC-11 also facilitated a three-way phone call between UCC-11, MASOUD, and YONATA. MASOUD told YONATA to work with UCC-11 while MASOUD was incarcerated.

137.   A search warrant was executed at UCC-11's residence later in January 2010 by local law enforcement. Seized was approximately $21,475 of suspected drug proceeds.

138.   MASOUD entered an *Alford* plea to the charge of possessing the marijuana from the hotel room with the intent to distribute it. He is currently serving a sentence of incarceration for that conviction.

B.    Confidential Sources

139.    Several confidential sources have come forward and discussed their involvement in CUTRI's marijuana distribution network. Three of those sources are discussed below.

        i.    *Confidential Source 2*

140.    A confidential source ("CS-2"), who is cooperating for in hopes of avoiding federal charges related to this investigation, provided the following information. Around January 2009, CS-2 started obtaining multiple ounces of marijuana from UCC-24. In July or August 2009, CS-2 met CUTRI through UCC-24 and learned that CUTRI was UCC-24's source of supply for marijuana.[15] CUTRI was living in Norfolk, Virginia, at that time. After meeting CUTRI, CS-2 started obtaining four ounces of marijuana directly from CUTRI every week or two. CUTRI fronted CS-2 the marijuana for $400 per ounce. On multiple occasions, CS-2 saw CUTRI retrieve marijuana from a USPS Priority Mail shipping box and provide that marijuana to CS-2.

141.    In September 2009, CS-2 opened his own P.O. Box at a Post Office in Norfolk, Virginia. CS-2 provided this address to CUTRI so that CS-2 could start directly receiving marijuana packages through the mail. Thereafter, CS-2 provided CUTRI with multiple addresses in Virginia and other states for the purpose of receiving marijuana shipments. CUTRI would coordinate the shipment and delivery of the packages. CUTRI would call CS-2 the day or night before and tell CS-2 to be ready because the package would be arriving on a specific date. CS-2 provided the addresses and coordinated with CUTRI via text, cellular telephone, and in person. On one or two occasions, CUTRI gave CS-2 the confirmation number for the marijuana package so that CS-2 could check on the status of the packages.

---

[15] CS-2 identified CUTRI in a photograph.

142.     CS-2 estimated receiving in total more than seventy packages through the mail, each containing between three to five pounds of marijuana. CS-2 paid CUTRI anywhere from $15,000 to $40,000 for each marijuana package that arrived, and CS-2 sold the marijuana for CUTRI. CS-2 related that the marijuana packages came from California, were often marked as having travelled through airports in San Francisco and Oakland, and often listed the sender as a "Mr. Johnson."

143.     On one or two occasions, CUTRI told CS-2 to go to a particular branch of Bank of America in Norfolk, Virginia, to deposit U.S. currency obtained from the sale of marijuana. CUTRI told CS-2 to deposit the money in an account in the name of JOHNSON, giving the account number and instructing CS-2 to deposit $7,000 each time. CUTRI told CS-2 that the deposits could not be $10,000 or more in U.S. currency because the deposits would be "red flagged."

ii.     *Confidential Source 3*

144.     A confidential source ("CS-3"), who is cooperating for in hopes of avoiding federal charges related to this investigation, provided the following information. In October 2009, MASOUD began to "front" CS-3 ounces of marijuana, and eventually began selling CS-3 pounds of marijuana. CS-3 learned MASOUD was obtaining this marijuana through CUTRI. CS-3 made a conservative estimate that he received approximately six to seven pounds of marijuana from MASOUD, which CS-3 sold in and around Alexandria, Virginia, for CUTRI and his co-conspirators.[16]

145.     CS-3 has had personal interactions with CUTRI. In February 2010, CUTRI threw a party for MASOUD at a club in Washington, D.C., to celebrate MASOUD getting out of jail

---

[16] CS-3 identified CUTRI and MASOUD in photographs.

on bond in connection with the January 2010 arrest, and to "initiate" CS-3 into the drug trafficking organization. CS-3 recalled that CUTRI spent $8,000 to $9,000 at the club that night on alcohol, to include bottles of champagne that cost $1,000 apiece. CS-3 further recounted a meeting that he had with CUTRI and MASOUD in Washington, D.C., in and around March 2010, during which CUTRI and MASOUD questioned CS-3 about a marijuana payment that had not been made by one of CS-3's associates.

iii.    *Confidential Source 4*

146.    A confidential source ("CS-4"), who is cooperating in the hope of avoiding federal charges in the current investigation, and in hopes of receiving consideration for pending local charges, provided information about CUTRI and his associates. CS-4 named CUTRI as the leader of a marijuana and oxycontin distribution organization in Virginia, West Virginia, and Ohio. California is the source of supply for the organization's narcotics, and CUTRI and his co-conspirators receive those narcotics in packages mailed from California. CS-4 had been longtime friends with people who worked for CUTRI selling marijuana. One of the people CS-4 knew who worked for CUTRI was MASOUD. CS-4 said MASOUD started dealing large quantities of marijuana in the Eastern District of Virginia back in 2002 or 2003. CS-4 recalled an incident several years ago at MASOUD's residence when MASOUD received a USPS package that, when MASOUD opened it, contained six pounds of marijuana.

147.    Starting around January 2010, MASOUD would front CS-4 about two pounds of marijuana each week, charging $5,800 per pound. After MASOUD's arrest in January 2010, UCC-16, who CS-4 met through MASOUD, took over for MASOUD and was responsible for coordinating the marijuana shipments through CUTRI and distributing the shipments that arrived. CS-4 obtained approximately three to four pounds of marijuana at a time each week

from UCC-16. CS-4 estimated he obtained marijuana from CUTRI through UCC-16 for about two months, during which time he obtained between twenty to twenty-four pounds in total. When UCC-16 was arrested on federal charges[17], CS-4 stated that YONATA took over his role in CUTRI's organization. CS-4 obtained distribution-level amounts of marijuana from YONATA up to CS-4's arrest in September 2010. CS-4 sold the marijuana he received from CUTRI and his co-conspirators.

148.     CS-4 explained how marijuana shipments from California were coordinated and sent. CS-4 provided addresses that could receive marijuana packages to MASOUD, UCC-16, or YONATA, who in turn provided them to CUTRI. CS-4 was paid $500 for each address. In order to get more addresses to provide to CUTRI and his co-conspirators, CS-4 paid his friends $200 or $300 in cash, or one or two pounds of marijuana, in exchange for using their address to receive marijuana packages.

149.     In the course of his involvement with CUTRI and his co-conspirators, CS-4 has opened mailed packages that contained marijuana, as well as eighty-milligram pills of oxycontin. CS-4 has seen what he described as "massive" amounts of oxycontin pills, estimating that he/she has seen at least 500 such pills in a package at one time.

150.     CS-4 has met CUTRI on a few occasions. One of those times was in the summer of 2010, when CUTRI initiated a meeting with CS-4 because CS-4 had been doing so well selling CUTRI's marijuana. Until his arrest, CS-4 had worked his way up through CUTRI's organization to the point where he was supposed to start having direct contact with CUTRI regarding the distribution of narcotics. CS-4 learned that CUTRI now lives in the Washington,

---

[17] UCC-16 and others were arrested and convicted in the United States District Court for the Eastern District of Virginia for conspiring to distribute oxycodone, for which oxycontin is the brand name, in violation of 21 U.S.C. §§ 841(a) and 846.

D.C., metropolitan area, but used to live in Norfolk, Virginia. CS-4 further learned that CUTRI

traveled frequently to California because supplying marijuana from California was his business,

and that CUTRI hand picks the quality of his organization's marijuana while in California.[18]

C.    Controlled Purchases, Payments, and Meetings

151.    CS-4 worked with law enforcement to proactively investigate CUTRI and his

distribution network, conducting several controlled purchases of marijuana, controlled payments

of drug debts, and meetings to discuss drug trafficking. Those incidents, all of which were

conducted at the direction and under the supervision of law enforcement, are discussed below.

152.    On September 30, 2010, CS-4 paid YONATA $6,000 for a prior drug debt.

153.    On October 1, 2010, CS-4 purchased approximately one pound of marijuana from

YONATA.

154.    On October 6, 2010, CS-4 paid YONATA $5,000 for a prior drug debt.

155.    On October 12, 2010, CS-4 paid YONATA $1,800 for a prior drug debt. The

meeting occurred at a restaurant in Falls Church, Virginia. Also present for the transaction,

according to CS-4, were CUTRI and other unidentified individuals. Prior to that meeting,

YONATA asked CS-4 for an address to which marijuana could be delivered. At the direction of

law enforcement, CS-4 provided a "controlled address" in Fairfax, Virginia, to CUTRI and

YONATA, stating that it was a good address for them to use to deliver a package of marijuana.

156.    On October 15, 2010, after YONATA told CS-4 that there was an incoming

shipment of marijuana, law enforcement established surveillance upon the address previously

provided by CS-4 to YONATA and CUTRI. The USPS was notified and subsequently

intercepted the package. CS-4 and YONATA waited together for the package to arrive (though

---

[18] CS-4 identified CUTRI, MASOUD, and YONATA in photographs.

law enforcement did not expect a package to arrive). The meeting was recorded. YONATA and CS-4 spoke regularly of "James," which is CUTRI's first name, prices that would be charged in the future for marijuana, and how "James" coordinated the shipments. When the package did not arrive, YONATA told CS-4 that "James" said a second mail carrier may be out later to deliver the package.

157.   Law enforcement eventually took custody of the intercepted package from a USPS Inspector. A subsequent search warrant executed on the package revealed approximately five pounds of marijuana inside. Each pound of marijuana was individually packaged. The return sender name on the package was "Mr. Johnson" with a California address known to be associated with JOHNSON.

158.   On December 20, 2010, in a meeting monitored by law enforcement, CS-4 met CUTRI and NAHOM for dinner at a shopping mall in McLean, Virginia. Law enforcement monitored the meeting with physical surveillance, but it was not operationally feasible to consensually record the meeting.[19] CS-4 told law enforcement that during dinner, CUTRI asked if CS-4 knew anyone that wanted some "cities." CS-4 was not familiar with the term, so CUTRI explained that "cities" was slang for oxycontin pills. CUTRI and NAHOM also talked to CS-4 about taking marijuana off their hands and stated that they have "good shit," by which CS-4 explained they meant that their marijuana is of high quality. CUTRI asked CS-4 how much cash he could come up with. CS-4 said maybe $20,000. CUTRI responded by telling NAHOM to provide CS-4 with $20,000 worth of marijuana and to front CS-4 an additional $20,000 worth of marijuana.

---

[19] CS-4 identified NAHOM in a photograph.

159.    After that meeting, CS-4 conducted three consensually recorded telephone calls with NAHOM from December 21, 2010, through January 2, 2011. During these conversations, CS-4 discussed the possibility of purchasing pounds of marijuana and up to 1,000 oxycontin pills. In two of the conversations, CS-4 mentioned "James" [CUTRI] and inquired if NAHOM had spoken to "James" about prices for oxycontin pills. NAHOM indicated he would meet up with him later and get back to CS-4. In the third consensually recorded telephone call, which occurred on January 2, 2011, CS-4 talked with NAHOM about buying oxycontin pills. NAHOM told CS-4 during that conversation that "he" (referring to CUTRI) didn't want to "fuck with it right now," by which NAHOM meant the sale of oxycontin pills to CS-4.[20]

160.    On February 11, 2011, CS-4 purchased of one pound of marijuana from CUTRI in Fairfax, Virginia, for $4,200.

VII.    SAAD AND POWERS

161.    SAAD and POWERS work with GUIDRY in the wholesale distribution of marijuana throughout the nation.[21] Based on my training, experience, and knowledge of this investigation, I believe GUIDRY and POWERS worked together in the distribution of marijuana in the past, going back to at least 2009. GUIDRY's statements, as intercepted on the wire, reveal that he taught POWERS and SAAD how to operate their marijuana distribution network. For

---

[20] I believe that CUTRI's hesitancy to deal oxycontin pills at that time was due, at least in part, to the guilty pleas entered by UCC-16 and others for their role in the conspiracy to distribute the pills.

[21] SAAD was identified through wire intercepts of GUIDRY, in which SAAD is referred to by "Munir" and talks on a phone subscribed to by him. Physical surveillance has also been conducted of SAAD on several occasions, revealing that the user of the phone registered to SAAD matches the physical description of a known photograph of SAAD. POWERS was identified early on in the investigation, and was intercepted through wire intercepts on SAAD's phone. CS-1, who at one time had regular telephone contact with POWERS, identified POWERS voice from an intercepted calls, and intercepted text messages and calls commonly refer to POWERS as "Marv" or "Marvin", which is POWERS's first name.

example, in an intercepted phone call on May 26, 2011, (TT4 #8634) GUIDRY told SAAD, "I'm not trying to dictate who you do business with, but you know what, I schooled all of you guys enough to where, in your case . . . I told you that you are getting shit on the arm [consignment, commonly referred to as "fronting"], your name is on the line and if a motherfucker decides not to cover a loss you are stuck with it and you gotta work something out. . . . So if you are getting something for twenty [$2,000] and I'm dumping that mother fucker for four [$4,000], if you can't get five, six, $700, you shouldn't be doing this shit."

162.    Later in the conversation, GUIDRY told SAAD about GUIDRY and POWERS's past relationship:

> GUIDRY: Marv [POWERS], [Redacted name], Ju Ju [WATSON], they all real tight, even though some of them know right from wrong, they are all out for self. . . . Did you ever ask yourself what sense does it make for Marv [POWERS] not to continue doing what we were doing? Me and him were splitting it. Look, me and him were splitting it up 50/50, and I was cut into his guys. What could be more better . . .all of them motherfuckers down in Kansas, all them fuckers that damn near told on us. I would get the weed, I would send it down there, and I fronted it to them until they paid us. Then him and I split up the profit.

> SAAD: Why was that?

> GUIDRY: Because those were his guys. Since those were his guys, I figure you keep dealing with your people, and you see how it worked out? When them motherfuckers got to telling they got to tellin' on him, not on me. They were trying to set him up. That motherfucker got so close to going to jail it was ridiculous, and that was because he wouldn't listen to me. . . . After the first person got busted, he started dealing with somebody else, and then the first person that got busted officially ended up telling on this dude. . . . Then he fucked around and we got a couple of packages caught up and we got a money package caught up coming back and that's when I was finished with him. . . . You should have asked yourself, damn, if Marv [POWERS] still doing it, I wonder why Ant's [GUIDRY] not doing it with him no more. It's not because Marv [POWERS] is slick, it's because he don't know how to read the signs. Do you know I haven't lost a package in thirteen

65

months? 'Cause I figured out a whole new way to do it.

163.    Based I my training and experience, and knowledge of the investigation, I believe that GUIDRY's reference to POWERS almost going to jail relates to the USPIS investigation in 2010, discussed above, that led to the seizure of four of GUIDRY and POWERS's marijuana packages.

A.      Guidry and Saad Continue to Work Together

164.    The investigation has revealed that, not only did GUIDRY teach SAAD how to operate a wholesale marijuana distribution network, the two continue to work together to facilitate the supply of their own networks. For instance, during the May 26th conversation discussed immediately above (TT4 #8634), GUIDRY and SAAD also talked about SAAD having a source of supply for marijuana and whether GUIDRY wanted to purchase anything from that source. GUIDRY told SAAD he would buy three pounds and would pay up front for two of them, taking the other one on the "arm." GUIDRY then said that he would get the money that weekend and then SAAD could take it and pay the source of supply. GUIDRY then asked, "What are you gonna get from this guy for me? A couple of Oranges, a couple of Lemons, and a Hawaiian [marijuana strains] will be fine." SAAD replied, "Alright." Also, GUIDRY said that he currently had "one King Kong," which I know to be a reference to one pound of a particular strain of marijuana, and that his source of supply might have four more ready to provide to GUIDRY. SAAD asked if GUIDRY would "let me check a piece of that [King Kong marijuana] when you get it, please." GUIDRY said, "You can see."

165.    On May 19, 2011, (TT4 #7552) SAAD and GUIDRY had a similar conversation:

> SAAD: Alright sir, so I got two people that got it. I got one guy that says it's ok, nice twenty-seven [$2,700 a pound]. I got another guy that says it's fire and he wants three [$3,000 a pound], and what's the best he can do it we buy four and he says probably

twenty-eight or twenty-nine [$2,800 to $2,900 a pound]. But he will have to make a phone call to let me know, but he says it's fire.

GUIDRY: How fast do you think they can get it?

SAAD: Tomorrow.

GUIDRY: Um, I guess I should've asked this dude. I didn't know Sour Diesel was that expensive right now.

SAAD: Everybody's wanting it, everybody. In fact, I didn't even know this guy had it like that.

. . .

GUIDRY: Hell, my guys are tired of Sour Diesel already.

SAAD: That's what I heard, too. I heard it's high yielder, it's a big plant.

GUIDRY: Yup, it'll probably be that way for another year or a year and a half. Do you know anyone doing any outdoor Sour Diesel?

SAAD: Uh, you know what? I got a big connection on outdoor, his numbers are not cheap though; he's got quality. His quality is really comparable to indoor, like you can't tell just by looking at, like your people, you know?

GUIDRY: What's not expensive?

SAAD: I'm saying he's not cheap. He gives it to me for nineteen [$1,900 a pound]. But I swear to God: I have never had a complaint.

GUIDRY: About what?

SAAD: Like about it. It's always been top-notch quality, like people ask for it. Like when I get it to them the first time, they ask for it again.

GUIDRY: Oh, I thought you said you get complaints.

SAAD: No, I said I've never had a complaint.

GUIDRY: Um, well that sounds better. If he gives to you for nineteen, um, we make a couple hundred bucks a piece for four of them.

. . .

GUIDRY: Hold on, I'm about to make a three-way call. Don't talk any numbers, but repeat some of that stuff and let me see what this guy might be interested in.

SAAD: Okay

[GUIDRY places three-way call to UCC-12 while SAAD remains on line]

UCC-12: Hello?

GUIDRY: Hold on, I got my guy on the phone. Listen to what he has to say.

UCC-12: Alright.

GUIDRY: Name off some of that shit that he's got over there.

SAAD: Um, Lemon Cush, Orange Cush, Maui Wowie, Urple Purple, um, Blue Hawaiian crossed with Chem Dog, Sour Diesel crossed with Train Wreck. Honestly this stuff, I've never had one complaint from anybody. Everybody that I've done business with is asking me for more.

UCC-12: You said Sour Diesel? . . . What would be the price on that, what would be (UI) four people?

SAAD: That's up to my big brother right there on the other line [GUIDRY].

UCC-12: Really to tell you the truth too, I'm really going to need ugh a little nub of each period just to have my homies (UI) right because this is what I do and if they like it then it's a go.

SAAD: That would be no problem.

UCC-12: Okay, then let's do the rock 'n roll.

GUIDRY: Ok, let me get the samples from you [SAAD] and I'll get them out to you over there [UCC-12].

68

UCC-12: So that's just the Lemon Kush and, uh, Sour Train Wreck, or whatever."

SAAD: I'll get my brother over there, everything I just you over the phone and then he can get it to you.

UCC-12: Ok, that's cool. Ok, that'd be great man.

SAAD: Alright, boss.

THREE WAY CALL ENDED

. . .

GUIDRY: You guys kill me. I got a dude doing twenty [pounds] every ten days and he cashes me out as soon as he get in on his end.

SAAD: But, I have no problem working with you.

166.     Interception of GUIDRY and SAAD's conversations has further revealed that they are currently are working together to rent property in California so that SAAD can grow marijuana that the two can use to further supply their distribution networks. GUIDRY has represented to the owner of the property that he wants to use it for a legitimate plumbing business. On June 6, 2011, (TT4 #9978), GUIDRY and SAAD spoke about the property and what their true intentions are for it:

GUIDRY: That guy in [Redacted location] called me. He emailed me. I haven't even opened up the email. Yeah, but he said I can't remember what I did with your email address. I gave it to him again and he said that he was gonna email the specs on the one over there in [Redacted location].

SAAD: Uh, huh.

GUIDRY: I don't know about that one. You know that you guys are in the same building.

SAAD: Huh?

GUIDRY: You know they got tenants in the building.

SAAD: On the other side of it, yeah.

GUIDRY: You keep saying on the other side. It's one building. He will, they are in one half of the building and you will be in the other half of the building.

SAAD: Exactly.

GUIDRY: Yeah, but are you talking about growing or you talking about sell?

SAAD: Growing.

GUIDRY: You don't think they are going to hear all of that noise and all that stuff?

SAAD: Not the way I do it.

GUIDRY: Ok, I mean I'm not tripping. That is not even my part of it.

167.    During that same conversation, GUIDRY informed SAAD that he was looking to set up a new distribution outlet in New York, which was based on his earlier conversation that day when WATSON told him he had a Jamaican in New York willing to be a distribution outlet for marijuana[22]:

GUIDRY: I'm alright. I got me a Jamaican out in New York now.

SAAD: Do you?

GUIDRY: Yep. So I need to, me and you need to sit down 'cause I need to probably, I'm just, just gonna shoot him a couple [samples of different strains of marijuana], um, make sure everything goes the way I want it to go.

. . .

GUIDRY: The guy in New York is waiting on me, so . . .

---

[22] That conversation (TT4 #9897) is discussed above in the section dealing with GUIDRY and WATSON.

SAAD: What do you want to send him? The same stuff?

GUIDRY: I mean, I'd like to send him some Urkle [marijuana strain] and then half and half. But if half and half is gonna break up a whole one for you . . .

SAAD: I don't care. I always break it. I don't care, that part doesn't bother me.

GUIDRY: Yeah, well I just want him to see, ok, here is some Urkle and you know here is, you know, is a half of a Pink Maui and Lemon, you know what I'm saying? Let him get a feel for the exotic shit, you know what I'm saying? Um, um, then we go from there. Because I'm actually, I actually have a middle man [WATSON] for this guy. I'll be responsible for the whole thing, but I have a middle man for this guy. And at nineteen [$1,900 a pound purchased wholesale], the numbers for him is gonna be forty-five [$4,500 a pound]. What is that, nineteen, um . . .

SAAD: Twenty-six [$2,600 in profit].

GUIDRY: No, a buck [$100] for my headaches for the troubles, and, um, mailing and all the bullshit. That would be twenty-five [$2,500 in profit] three ways [between GUIDRY, SAAD, and WATSON]. I'm not made at 800 bucks, you know what I'm saying?

SAAD: Yeah, I'm happy. I'm very happy.

GUIDRY: We make 800 bucks on each one of them [pound] and the sooner [UI] it'll be five and ten [pounds] at a time. You know, so, you know, looking at four grand every five [days], eight grand every ten [days]. And it will be a fast turnover, you already know, 4,500.

SAAD: New York, man, I'm telling you, New York is the place. If you got this guy there, let's hold him with two hands and and, treasure him, because New York is the place. If you can build a relationship with him and keep them on a regular basis.

B.    Saad and Powers Share Distribution Network in Kansas and Missouri

168.    SAAD and POWERS presently are working together to distribute marijuana to, among other states, Kansas and Missouri.

169.    On April 20, 2011, (TT6 #194) SAAD and POWERS were intercepted talking about a $4,000 deposit made into a bank account and whether the deposit was made by UCC-19 (a marijuana distributor of theirs who is located in Kansas City) or someone else for prior drugs provided:

> SAAD: [UCC-13] text me earlier today. He said there was some money put in his account yesterday and he didn't know if it was from us or not . . .

> POWERS: I don't believe so. I know [UCC-19] told me he was gonna start making drops, but he wasn't talking about doing it until today. . . . Hell, I didn't give anybody [UCC-13] information. I never got [UCC-13] information.

> SAAD: No you did before, they did a drop in there before. . . . You may want to ask [UCC-19]

> POWERS: [UCC-19] might have, did he say what it was? [UCC-19] was supposed to do some drops but I told him specifically to do it in, um, mine and [Redacted name]'s because I didn't know if you had one open at the present time.

> SAAD: No, I didn't have a B of A, but I've given you his B of A before and they had dropped money in there before.

> POWERS: I will find out. I was in contact with him. I haven't talked to him today and I talked to him yesterday morning. He said he was gonna make some moves. I told him where to go to, so if he did it, it's a possibility but I doubt it.

> . . .

> SAAD: He said somebody deposited $4,000 yesterday . . .

> POWERS: That sounds about like one of [UCC-19]'s amounts. . . . I'll find out.

170.    During that same conversation, POWERS said that UCC-19 was asking if SAAD and POWERS could provide him with "the girl." POWERS added that UCC-19 wanted to be able "to do a line and make his whole face numb." SAAD replied that he could obtain the

product and that he would be able to judge if it was of "high quality" because he had obtained his "good judgment" from "the old man." Based on the context of the conversation and my training and experience, I believe that, in addition to the marijuana he is already receiving, the product UCC-19 wanted also to be supplied by POWERS and SAAD was powder cocaine. I further believe that SAAD was referring to GUIDRY as the person from whom he learned how to judge cocaine. This is based, in part, on a conversation GUIDRY had with UCC-2 on April 14, 2011, (TT4 #1906) in which he explained that "tree [marijuana] is not the only place to make money" and that he used to sell "the white girl" to people in Hawaii. He said that he would buy the "white girl" for between $12,000 to $13,000 and sell it for $34,000, using his children or the children of his partner to courier the money from Hawaii back to California. I know from my training and experience that "white girl" is a term often used to refer to powder cocaine, and that the prices GUIDRY was referring to were for one kilogram quantities of the drug.

171.   On April 28, 2011, (TT6 #1646) SAAD and POWERS discussed the purchase of marijuana:

> SAAD: I'm looking at the stuff. It's beautiful. Like I say it's not the dark one but it's got color, got a lot of smell, a lot of you know, it looks good. But it's three GDPs [Granddaddy Purples] and one BD [Blue Dream]. What do we want to do? Do we want to do the arm [front] for three or do we just want it for twenty-eight [$2,800 a pound]?
>
> . . .
>
> POWERS: When does he want the money?
>
> SAAD: . . . Let me ask him and call you right back.

172.   On April 29, 2011, I believe they discussed the address to which a marijuana package had been shipped. POWERS asked SAAD, "Tell me the address where the package went to, the name and address." SAAD responded "It's the one he sent me last, [Redacted street

number and name]. It's coming to you right now. I don't want to say it on the phone." (TT6 #1792). Immediately following the intercepted call was a text message from SAAD to POWERS with a name and address from Missouri. (TT6 #1805).

173.   On May 4, 2011, (TT6 #2754) SAAD and POWERS discussed two of their customers, including UCC-19 and UCC-20 (another marijuana distributor located in Kansas City, Missouri):

> POWERS: [UCC-19] kinda been on my case real tough. I guess he told some people he was gonna have some coming and I guess they been on his case so me and him had an argument. . . . He was mad 'cause he was running around telling everyone it was coming and then when it didn't come he was like what the fuck? You know he has to pay the people where it comes to so when he only sees one package, he was like I can't have two packages coming to the same spot. Their competition everywhere. It's basically like with [UCC-20]. I might be losing [UCC-20] 'cause it's a lot of competition and [UCC-20] ran into somebody in Las Vegas that told him that they could get it to him for 3,200.
>
> SAAD: Oh shit. Even if they get it to him for that he's gonna be disappointed when he gets it.
>
> POWERS: . . . I seen the shit. What he had at the time was some Lemon Kush and that shit was way on that shit we had. I'm talking about the buds looked great. It was frosty as fuck.
>
> SAAD: I'm having a hard time right now getting Lemon Kush indoor that is good quality for less than three grand. The prices are coming back strong.
>
> POWERS: . . . It was a white guy, he was like they people grow.
>
> SAAD: I know a lot of growers and even now they are holding on to their numbers. We have some beautiful stuff coming, next week we will be able to do our usual thing. . . . Maybe if it appeases him we will do ten [pounds] instead of five [pounds] unless you are only comfortable doing five and the regular, and the way we've been doing it.
>
> POWERS: Right now he's only comfortable being five. . . . He says at five he still hasn't gotten rid of the last one really yet.

SAAD: The first five or the last four I sent him?

POWERS: No, I'm talking about [UCC-20] . . . 'cause we kinda sent him some bad quality and everyone around town been having the shit. If we would have sent that shit we sent [UCC-19], he would have been through a long time and he probably wouldn't be complaining too much. . . . I know I have to drop the numbers a little bit for him, but I mean if we steady give him the shit it won't be as bad but it's very competitive now.

174.   POWERS and SAAD discussed on May 7, 2011, (TT6 #3453) how much it costs to mail marijuana packages. SAAD stated that, "I had one and half [pounds] going to [UCC-13] and I had the five [pounds] going to [UCC-19]. It should be right around $200 for each package, and $200 for you and I. If it's a little bit more I'll cover you." POWERS later said, "Oh, ok. I was just trying to figure out why it cost that much 'cause I never spent that much."

175.   On May 13, 2011, a search warrant was executed on UCC-19's residence in Missouri. Located during the search was approximately three pounds of marijuana, one gram of cocaine, and weighing scales.

VIII.   POSSESSION OF FIREARMS AND USE OF VIOLENCE

176.   In addition to the facts presented above, the following demonstrates that members of the conspiracy possess firearms and are willing to use violence to further their drug trafficking.

A.   Johnson

177.   In an intercepted call between JOHNSON and UCC-17 on April 16, 2011, (TT3 #6201) UCC-17 told JOHNSON that he had been paid in counterfeit currency for marijuana that JOHNSON had supplied him. JOHNSON responded by directing UCC-17 to use force if necessary to collect the money:

UCC-17: Alright, with that, with that funny money bro, you think I should hit up that McDonald's or something and hit about six of them holes [use a firearm]?

JOHNSON: Honestly [UCC-17], I don't know what you should do with that fucking money. I mean me, personally, I take that motherfucking pistol and go get my motherfucking money. You need to give it to me or he gonna have problems. Pretty much how I look at nigga give me some funny money, nigga pretty much saying, "Fuck you nigga, you ain't gonna do shit." That how I take it. Nigga come bring me some funny money, it's all bad, time to go to war. Nigga it ain't like it's a fucking mistake, nigga just gave you a fucking hundred dollars you know what I'm saying? Nigga gave you six hundred you know. . . . You need to go, like I said, you need to go get that pistol or, nigga, if it's niggas you don't like, go buy that shit from them niggas [pass the counterfeit money on].

B.    Saad

178.    SAAD spoke with an unidentified female (referred to below as "UF") twice on May 12, 2011, and it is my belief based on the context of their conversations, and my training and experience, that SAAD was trying to obtain from her a handgun with a silencer. The first conversation contained some of the following dialogue (TT6 #4655):

SAAD: You know that thing I had in my hand yesterday? You had a couple of them.

UF: Yeah. Which one, the little one or the one in the box?

SAAD: No, I want one with an exhaust on it.

UF: You said you want one with what?

SAAD: The exhaust on it.

UF: Exhaust?

SAAD: You hear me? [The call was dropped]

179.    When SAAD called UF back, they continued speaking about the "exhaust" (TT3 #4685):

SAAD: You know I need one, with an exhaust on it.

UF: What do you mean an exhaust? That doesn't make sense to me.

SAAD: Ask [Redacted name].

UF: [Asking person named by SAAD] . . . He doesn't even know what you mean.

SAAD: Point at his thing and tell him I need one with an exhaust. He'll know what I mean.

UF: He said he don't know what you mean. Text it to me.

SAAD: Man.

UF: You mean an extension?

SAAD: You asked me a couple of weeks ago if I knew someone that has them.

UF: An extension?

SAAD: No, quiet [silencer].

UF: Oh, oh, ok. What about it?

SAAD: I need one.

180.    On June 1, 2011, (TT4 #9209) SAAD called GUIDRY five times in relatively quick succession, but did not reach him. On the sixth call he finally did, and they had the following conversation about what I believe to be SAAD being robbed:

GUIDRY: Hey, you alright?

SAAD: Yeah, yeah, yeah, yah. Umm, I am going to have to call you back. Um, ah, I was calling to see if you had something [a firearm]. But I got one already. Uh, trying to catch up with this piece of shit.

GUIDRY: Who?

SAAD: He took off with five [pounds of marijuana] and I found out where he is at.

GUIDRY: Who? Who? Who? Who? Who?

SAAD: This guy. But I am right here. I got somebody with me. But we are pulling up right now. Let me call you back in a minute please.

GUIDRY: What city are you in?

SAAD: Antioch.

GUIDRY: Antioch?

SAAD: Uh huh.

GUIDRY: Well if you need me, I'm just a call away. And I already got somebody out there. I got, uh, Justin [JOHNSON] has got some of my shit out there, and so does [UCC-25].

SAAD: Give me, give me a few minutes. Let me see what is going to happen here.

C.   Watson

181.   On April 15, 2011, (TT4 #2134) WATSON explained to GUIDRY that WATSON's girlfriend was arrested that day with WATSON's gun: "Shit I'm down here, ah, about to go to my partner court date and then, ah, I had [GIRLFRIEND], ah, she had to park the car, ah, my partner car. Me and him ran in there right quick to go, ah, my nig court date. He on trial for murder. Ah, my girl she went, I guess she drove [UI] hella dumb streets out here, so the police got on her 'cause her license suspended. I guess she had paid her tickets yesterday but that didn't clear yet. And they found her with my gun. They got her arrest right now. Trying to get her bailed out, right now; downtown trying to get her ass bailed out."

182.   According to a California Highway Patrol incident report, a traffic stop of a woman with the same alias that WATSON uses to describe his girlfriend was contacted during a

traffic stop on April 15, 2011, in Sacramento, California. According to the report, a strong odor of marijuana was emitting from within the interior of the vehicle. The woman admitted to marijuana being in the car but claimed the car did not belong to her. During a search of the vehicle, three suspected marijuana "roaches" were found in the ashtray of the vehicle, and a Springfield XD .40-caliber pistol, loaded and with a round in the chamber, was found in the woman's purse.

183.    On June 11, 2011, WATSON was arrested and charged in Sacramento for possession of the .40-caliber pistol. WATSON was in his apartment at the time of arrest, and law enforcement found there a pistol magazine loaded with .40-caliber ammunition.

184.    During recent intercepted communications between GUIDRY and WATSON from May 29, 2011, and later, the two have talked about the recent murder of a family member of WATSON's in Vallejo, California. Both local and federal law enforcement officers operating in Vallejo have confirmed that the murder occurred and that the victim is related to WATSON. WATSON and GUIDRY have made statements that law enforcement believes may be a possible reference to WATSON and/or his associates planning to commit a retaliatory act of violence against the believed murderer. Specifically, on several occasions, GUIDRY offered to help WATSON get out of town immediately after WATSON "took care of some unfinished business."

D.    Guidry

185.    On April 30, 2011, (TT4 #3959), GUIDRY had the following exchange with an apparent female relative (referred to below as "UF") about the steps he has taken to collect drug debts:

79

GUIDRY: When I don't get paid, it's like somebody saying, "Fuck my kids," because, you know what? I take my money and I take care of my family. So . . .

UF: Yeah.

GUIDRY: You know, I did, I did done real bad shit in my life. I did, I did kidnapped kids until they parents paid me.

UF: [Laughing] No, no, no. I have virgin ears.

GUIDRY: Well, sorry. I went to Oakland and picked up one of my little nephews, who was nine, and I dropped him off at the school. And I told him, "You go over there and stomp the shit out of that little seven-year-old girl right there. And that's what he did.

UF: . . . That's so mean! That was a little kid!

GUIDRY: You know what? We were talking thirty, $40,000 back in the early nineties.

186.    In a call on May 8, 2011, (TT4 #5141), GUIDRY recounted to an unidentified co-conspirator that, "Some motherfucker, um, probably about thirty minutes after you guys left, somebody came over and pounded on my door two times and I seen 'em run across my yard. . . . So I am like, I'm gonna grab a pistol and jump in a car and, uh, I didn't get much sleep." Later in the conversation, GUIDRY stated, "I'm like, motherfuckers want to, yeah, because I'm shooting through doors and windows and everything." According to California Department of Justice databases, GUIDRY's wife purchased an Industrial Argentina Thunder 380, .380-caliber pistol, on January 3, 2010. GUIDRY is a felon and therefore prohibited from purchasing a firearm.

E.    Guidry and King

187.    On May 24, 2011, (TT4 #8223) KING and GUIDRY discussed what to do with a customer who owed a $500 marijuana debt to KING:

GUIDRY: How much (UI)?

KING: Just, just, just about 500.

GUIDRY: That's what I was telling you.

KING: That constitutes an ass whooping at least. At the least.

GUIDRY: Ah, you know what? That's why you gotta do everything cash and carry. It ain't no frontin' them niggas nothing.

KING: Ain't no frontin'. But hey, they got my family up in the house and I don't know these people so I kinda want people to do to work like you. Actually, that that's what you want is motherfuckers to put work in and without doing shit.

GUIDRY: You just gotta find one of them youngsters and, uh, send them motherfuckers to track dude down and beat his ass. Drag him back to you.

KING: But me, you know I shouldn't do it though?

GUIDRY: Nah, I wouldn't to them.

KING: My girl telling me it's really not worth it. She said it's really not worth it.

GUIDRY: You're down there in Indian Territory and everything else you need to find one of them little niggas . . .

KING: No, no, no, no, no. I do got them young boys on deck though. But nah, he just knew that I, I got this enough information to know that he just one of them shady motherfuckers. But I got . . .

GUIDRY: I know, but I'm saying you in an alien, you in an alien environment [Virginia, rather than his native California]. You need to find one of them youngsters and tell one of them youngsters look, you find this nigga and, uh, stomp him down for me and I'm gonna put you on.

KING: Ok that's cool. Aight, aight, aight. 'Cause that's what I'm gonna do.

188. On June 3, 2011, (TT4 #9550) KING told GUIDRY he had another debtor who would not pay for marijuana KING previously provided him, and who was threatening KING.

GUIDRY: Aight, but that's what I'm saying. Before you do that, put a few dollars or put some of that shit [marijuana] in dude pocket and tell him, you know, to go, tell due to whoop dude's ass really bad and tell him, "Here's the answer to your threat."

KING: Aight. I'm just, I'm just gonna stop nigga and do it myself. But alright.

GUIDRY: You know what?

KING: Ok.

GUIDRY: That's what you don't want to do. What you wanna do is let that nigga know, "I'm not from out here [Virginia] and I can have somebody from out here [California] take you off."

189.   The two spoke again about the situation later that same day (TT4 #9566). KING told GUIDRY, "Alright, I might, um, I got me a strap [gun] but, but I might need another one, little bigger one or something [UI] You got one? You got another one?" GUIDRY responded, "Down here [California]. . . . It ain't gonna help you down there [Virginia]." KING said, "I would like to see you roll up through this bitch [to use violence to handle the situation]." GUIDRY said, "I'm sure thinking about it now."

190.   The next day, KING told GUIDRY that he had reached out to a relative, UCC-14, to come help handle the situation with the debtor. GUIDRY said he would fly UCC-14 from Reno, Nevada, where UCC-14 resides, to Norfolk, Virginia, to help KING. Thereafter, UCC-14 called GUIDRY (TT4 #9777), who told UCC-14 that he would pay for his airline ticket. GUIDRY said, "I don't like that nigga [KING] down there by himself," and then, to further entice UCC-14, said, "They down there talking a gang of shut, but, um, it's wide open if you go down there you a, y'all can fill your pockets up real fat [by selling marijuana]." GUIDRY further told UCC-14 that KING, "already got some cap guns."

191.   GUIDRY then called KING and they spoke about the following (TT4 #9779):

KING: What's up dog?

GUIDRY: Hey [UCC-14] just called me. Ah, I told him to, ah, text me his information and we will get him a ticket so, ah . . .

KING: That's what I need. That's all I need. That's all I need.

GUIDRY: I know, but, ah, I told him you had a piece [gun] for him when he got down there. But you gonna need to grab another one.

KING: Um, alright. Well alright. Well it is, I'll just take a nigga truck. Nigga I ain't worried about that 'cause ill beat a nigga with a bat you hear me?

GUIDRY: Ok, well you do it how you want to.

KING: See this shit going down man.

GUIDRY: I'll get him down there as soon as he sends me his information. I'll get him out, out of here in the next day or two.

KING: Um me and [UCC-14] don't need nothing but looks buddy, don't worry about nothing. Get that nigga to me and lets get cracking, alright.

192.    A few hours later, KING sent GUIDRY a text message that read, "Al right got strap foq [sic] [UCC-14] 100." (TT4 #9810). Based on your affiants training and experience and knowledge of this investigation, I believe that GUIDRY told KING to acquire another gun for UCC-14, and that KING responded later via text message to let GUIDRY know he had a gun for UCC-14 and it cost KING $100.00.

## CONCLUSION

193.    Based on the foregoing, your affiant submits there is probable cause to believe that, from in or about 2005 to the present date, within the Eastern District of Virginia and elsewhere, GUIDRY, JOHNSON, CUTRI, SAAD, POWERS, BRIONES, MASOUD, NAHOM, YONATA, NATHANIEL, JEREMIAH, WATSON, KING, PATINO, and SOLORIO did

unlawfully, knowingly and intentionally, combine, conspire, confederate and agree with each other and with other persons, both known and unknown, to unlawfully, knowingly and intentionally distribute 100 kilograms or more of a mixture and substance containing a detectable quantity of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Glenn Mai
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me this 14th day of June, 2011.

/s/
John F. Anderson
United States Magistrate Judge

84